In re CS ASSOCIATES d/b/a University Nursing and Rehabilitation Center, Debtor.

UNITED JERSEY BANK, Indenture Trustee, Plaintiff,

v.

CS ASSOCIATES d/b/a University Nursing and Rehabilitation Center; The Philadelphia Authority for Industrial Development; Pennsylvania Millers Mutual Insurance Company; and Mitchell W. Miller, Trustee, Defendants.

Bankruptcy No. 88–12842S.
Adv. No. 90–0275S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 5, 1990.

2. Mr. Schnorr did not seem to be prepared to back his appraisal with facts and data.

Mitchell W. Miller, Philadelphia, Pa., Trustee.

Edward J. DiDonato, Camille Spinale, Kathy McAlice, Philadelphia, Pa., for Trustee.

John J. Francis, Jr., Morristown, N.J., William F. Sweeney, Philadelphia, Pa., for plaintiff United Jersey Bank.

Michael F. Henry, Philadelphia, Pa., for defendant Pennsylvania Millers Mut. Ins. Co.

Philip M. Brandt, Philadelphia Industrial Development Corp., Philadelphia, Pa., for defendant Philadelphia Indust. Development Corp.

Marvin H. Mercer, III, Philadelphia, Pa., for debtor.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

We herein decide two matters related to the above entitled case, both of which were initiated by UNITED JERSEY BANK ("UJB"), the Trustee under a Trust Indenture ("the TI") through which construction of a nursing home formerly operated by CS ASSOCIATES, d/b/a UNIVERSITY NURSING AND REHABILITATION CENTER, the Debtor in this case ("the Debtor"), was financed. The first is the above-captioned adversary proceeding, in which UJB seeks a declaration of its rights to the potential proceeds of a hazard insurance policy on the Debtor's facility. The second is a motion in the Debtor's main bankruptcy case for a declaration of UJB's rights to sums held by it in the Bond Fund ("the BF") and Bond Reserve Fund ("the BRF") created in the TI and/or relief from the automatic stay to utilize these sums for the exclusive benefit of the Debtor's bondholders.

The adversary proceeding ultimately presents the issues of whether a mortgagee who is deleted from an insurance policy by a mistake made principally by the insurer continues to possess an insurable interest, despite such deletion. We conclude that, despite the possibly unilateral nature of the mistake of the insurer, Defendant PENNSYLVANIA MILLERS MUTUAL INSURANCE COMPANY ("PMMI"), PMMI's expressed intention to insure UJB's interest but for its mistake allows us to reform the policy to include UJB as an insured party. We also hold that UJB is entitled to assert the status of an insured party under an "equitable lien" theory as to PMMI. However, we are uncertain as to the priority of UJB's security interest in the insurance proceeds relative to that of Defendant MITCHELL W. MILLER, ESQUIRE, the Trustee of the Debtor's estate ("the Trustee"), and hence we do not decide this issue at this time.

With respect to the issue of UJB's rights to the sums in the two bond funds, we conclude that the Debtor, as settlor, created express trusts in favor of the beneficiary-bondholders when those funds were established. Therefore, we conclude that, while these funds may be property of the Debtor's estate, the Debtor's slight interest therein as a mere settlor of a trust authorizes UJB, as trustee, to obtain relief from the automatic stay to utilize these sums for the sole benefit of the bondholders.

## B.  PROCEDURAL HISTORY

On August 15, 1988, the Debtor, then operating a nursing home located at 747 South Broad Street, Philadelphia, PA. ("the Facility"), filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code.  The case has had a long history, in which UJB has been an active participant.  At the outset, the Debtor unsuccessfully sought to prevent the Commonwealth of Pennsylvania Department of Health from closing the Facility due to its failure to provide adequate services to its patients.

After the Facility was closed in late 1988, the Debtor's Official Unsecured Creditors' Committee presented a Plan of Reorganization which featured the sale of the Facility to an entity which apparently intended to purchase and operate it in tandem with an adjacent hospital with partially interlocking ownership, also in bankruptcy and also closed to patients post-petition.  *See In re University Medical Center*, Bankr. No. 88–00003S.  However, this effort failed because the Facility was severely vandalized· in December, 1989, prior to confirmation of the Plan.

Unwilling to abide the extended process of attempting to resurrect the sale transaction after potential insurance claims were resolved, this court, on a motion of the United States Trustee which was supported by UJB, converted this matter to a Chapter 7 case on April 18, 1990.  The Trustee was appointed on April 25, 1990.

On April 24, 1990, the day before the Trustee's appointment, UJB filed its original Complaint in the instant adversary proceeding, thereafter amended on June 25, 1990, to, *inter alia,* add the Trustee as a party, designating the proceeding as one to Establish Extent and Validity of United Jersey Bank's Security Interest in Insurance Proceeds.  The relief sought therein was

that judgment be entered 1) establishing UJB's valid, perfected, first priority security interest in any insurance proceeds which are currently payable or which may in the future become payable to the Debtor or to [Defendant PHILADEL-PHIA AUTHORITY FOR INDUDSTRIAL DEVELOPMENT ("PAID" or "the Authority") ];  2) requiring that these aforementioned insurance proceeds be paid to UJB as Trustee; 3) declaring that UJB as Trustee has the sole right to receive the proceeds of such policies and to collect and receipt for claims thereunder;  4) declaring that all losses shall be payable to UJB as Trustee notwithstanding any act or neglect of the Authority or of the Debtor;  5) directing that all insurance proceeds be held by the Trustee as security for all bonds then outstanding until paid out to the Bondholders pursuant to the terms of the Trust Indenture; and 6) for such other and further relief as this Court deems just and proper.

The Answer and subsequent responses filed by PMMI denied that liability existed under its pertinent hazard insurance policy extending from May, 1989, to May, 1990 ("the 1990 Policy"), due to the failure of the Debtor (or any party acting on its behalf) to properly file a claim.  The Trustee also filed an Answer denying UJB's priority to the insurance proceeds vis-a-vis his interest in it.

On June 11, 1990, PMMI filed what it termed a Motion to Withdraw Reference and for a Jury Trial relating to this proceeding in this court.  Recognizing that only the district court could decide that aspect of the motion requesting withdrawal of the reference and being aware that trial was scheduled on June 20, 1990, we immediately entered an Order on June 12, 1990, declaring that this proceeding was core in nature

because it clearly relates to a cause of action which arises in the course of post-petition administration of the Debtor's case.  *See In re Ben Cooper, Inc.*, 896 F.2d 1394, 1397–1400 (2d Cir.1990) [, *cert. granted,* —— U.S. ——, 110 S.Ct. 3269, 111 L.Ed.2d 779 (1990), *remanded,* —— U.S.——, 111 S.Ct. 425, 112 L.Ed.2d 408 (1990) ];  *In re Arnold Print Works, Inc.*, 815 F.2d 165, 168–71 (1st Cir.1987); *Valley Forge Plaza Associates v. Firemen's Fund Ins. Cos.*, 107 B.R. 514,

516–18 (E.D.Pa.1989); and *In re Jackson*, 90 B.R. 126, 129–30 (Bankr.E.D.Pa. 1988) [, *aff'd*, 118 B.R. 243 (E.D.Pa. 1990) ].

The order also noted that we were disinclined to stay the trial on June 20, 1990, while the district court considered the motion to withdraw reference of the proceeding. Instead, we requested that the parties file, on or before June 18, 1990, Statements and Briefs addressing "whether [PMMI] is entitled to a jury trial in this court, whether the jury demand has been waived, and whether this court can conduct a jury trial."

On June 12, 1990, PMMI also filed a motion to dismiss the proceeding for failure to state a claim against it. · On June 15, 1990, UJB filed a motion for summary judgment in this proceeding in its favor.

On the June 20, 1990, trial date, the parties requested and we agreed that the trial should not go forward and that a schedule for disposition of the matters filed in the proceeding should be devised instead. The result of this colloquy was an Order of June 22, 1990, which, *inter alia*, provided a schedule for amending the Complaint and deciding any dispositive motions pressed by the parties, and set a new trial date of September 27, 1990. UJB ultimately pressed its summary judgment, although PMMI abandoned its motion to dismiss.

On September 11, 1990, the Honorable Jan E. DuBois of the district court entered an Order denying PMMI's motion to withdraw the reference of this proceeding to that court. In so doing, Judge DuBois expressly approved that aspect of our Order of June 12, 1990, holding that the instant matter was a core proceeding. In light of this Order, this court, on September 14, 1990, filed an unreported Memorandum and Order denying (1) that aspect of PMMI's. Motion requesting a jury trial in this proceeding; and (2) UJB's Motion for Summary Judgment.

In our analysis of the jury-trial issue, we determined that the first two prongs of the three-pronged analysis for determining whether a jury trial may be demanded in a bankruptcy proceeding, established as follows in *Granfinanciera v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 2790–2802, 106 L.Ed.2d 26 (1989), were absent: (1) whether the action was traditionally legal in nature as of the date of the enactment of the Seventh Amendment in the late 18th century; and (2) whether the remedy sought was legal or equitable in nature.

Noting the prayer for relief in the Complaint quoted at page 945 *supra* and thus focusing on the second "more important" factor set forth in *Granfinanciera, id.,* 109 S.Ct. at 2790, we concluded that the remedy sought was equitable in nature. We pointed out that all that UJB sought in the proceeding was a determination of its status under the 1990 Policy. We noted that not only were no monetary damages sought, but there was no attempt to obtain a declaration of the liability of PMMI, as insurer, as to UJB or as to any other party. We felt that PMMI's contention that its liability under the policy should also be resolved in this proceeding had practical merit, but that UJB, as plaintiff, had chosen not to proceed to litigate that issue in this proceeding.

As PMMI notes in its Brief, UJB's decision to proceed as it did was apparently influenced by its fear that the named-insured Debtor had not complied with the requirements of the 1990 Policy, thus jeopardizing the rights of the Debtor (or any other party) to collect on the 1990 Policy. Nevertheless, we continue to question why UJB could not have litigated all issues concerning the rights of all parties to the insurance proceeds in a single lawsuit. Consequently, the outcome of the instant proceeding may merely set the stage for further litigation between UJB and PMMI.

UJB's request for summary judgment was denied because an examination of the evidential record before us revealed that issues of material fact remained to be resolved before this proceeding could be decided. Most significant was the dispute concerning the communications which passed between BCA Corporation ("BCA") and PMMI. Also of concern to us was whether BCA was involved in an agency relationship with PMMI and/or with the

Debtor. The ultimate significance of the agency issue was, however, blunted considerably by our Finding of Fact ¶ 22, at page 950 *infra*, that the deletion of UJB from the 1990 Policy was due principally to a mistake on the part of PMMI, not BCA.

Late in the day on September 26, 1990, the day before the trial date established in our Order of June 22, 1990, UJB filed a motion for a continuance of the trial pending a hearing on its motions for reconsideration of this court's order of September 14, 1990, and for leave to file a second amended complaint and to complete discovery. Also, on September 26, 1990, UJB filed, in the adversary proceeding, the Motion to Obtain a Declaratory Judgment regarding its entitlement to the sums in the Bond Fund and the Bond Reserve Fund and/or for relief from the automatic stay which is now also before us for disposition. We summarily denied the motions for a continuance and for reconsideration of the Order of September 14, 1990, during the early minutes of the trial on September 27, 1990. At that time, this court advised UJB that the motion regarding the disposition of the sums in the BF and BRF was a matter which should be presented in the Debtor's main bankruptcy case, not in the course of the instant adversary proceeding, and we expressed an intention to so list it for disposition.

The trial was not commenced until the early evening hours of September 27, 1990. Because of this regretfully late start due to a very long hearing list of that day, completion of the trial had to be carried over until October 4, 1990. We should note that, in the course of the proceedings on September 27, 1990, PMMI filed a motion in limine to preclude the expert testimony of Wesley K. Fritz ("Fritz") proferred by UJB. The substance of the motion in limine was a challenge to the relevancy of Fritz's purported expertise of the practices in the insurance industry and that PMMI had received inadequate notice of Fritz's engagement by UJB. We put off Fritz's testimony until October 4, 1990, to eliminate the notice issue.

During the early minutes of the trial on October 4, 1990, we denied PMMI's motion in limine on the basis of two recent decisions of the Third Circuit Court of Appeals which held that expert testimony should be freely admitted, *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 852–60 (3d Cir.1990); and *DeLuca v. Merrell Dow Pharmaceutical, Inc.*, 911 F.2d 941, 952–57 (3d Cir.1990). *See also American Technology Resources v. United States*, 893 F.2d 651, 655–56 (3d Cir.1990); and *Linkstrom v. Golden T. Farms*, 883 F.2d 269, 270–72 (3d Cir.1989).

By a post-trial Order entered on October 5, 1990, we set forth a schedule in which all parties to the adversary proceeding would have an opportunity to file Proposed Findings of Fact and Proposed Conclusions of Law, as well as post-trial Briefs, to be completed by November 2, 1990. On October 26, 1990, the parties to this adversary proceeding were directed to attend a settlement conference with the Honorable Judith H. Wizmur of the District of New Jersey. The parties were firm in their belief that settlement of this proceeding, at that stage, was impossible.

UJB's motion for declaratory relief or relief from the stay in the main case, due to a deficiency in its service of same, was not ripe for disposition until November 20, 1990. On November 19, 1990, counsel for UJB and the Trustee, the only party opposing the motion, agreed to have that motion decided on the record made in the adversary proceeding. Although this issue had inexplicably been briefed by UJB and the Trustee in their submissions relating to the adversary proceeding, both parties took advantage of our invitation to remit supplemental submissions on this issue by November 23, 1990. As indicated previously, we will decide that motion as well as the proceeding in this Opinion.

In accordance with Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a) and due to the presence of significant factual issues, we shall render specific Findings of Fact relevant to all matters before us and follow this with a Discussion which constitutes our Conclusions of Law.

## C. FINDINGS OF FACT

1. On February 16, 1983, the Debtor entered into an Installment Sale Agreement ("the ISA") with PAID[1] in order to finance the acquisition, construction, and equipping of the Facility.

2. This project was funded by the issuance of revenue bonds ("the Bonds"), which were issued and secured pursuant to the terms of the TI. The Bonds' principal, interest, and premiums, if any, were payable to UJB, which as the Indenture Trustee under the TI, represented the interests of the bondholders.

3. In accordance with the terms of the ISA, PAID assigned all of its interests and rights in, and all monies payable under, the ISA to UJB. Also, the Debtor mortgaged the real property and granted a security interest in the personal property comprising the Facility to PAID, which in turn assigned its interests to UJB. UJB perfected its numerous rights and interests by filing UCC–1 financing statements which covered

> [a]ll present and future rights of [PAID] arising under that certain [TI] ... between [PAID] and Secured Party [UJB], including all right, title and interest of [PAID] in and to the [ISA], all pledged revenues under the [TI], all funds and all income and receipts on funds held by [UJB] under the [TI], and all accounts, contract rights and general intangibles arising thereunder or related thereto, and all proceeds thereof.

4. The TI provided for the creation of several funds to protect the interests of the bondholders. One such fund was the BF, into which UJB was obliged to deposit all proceeds on the bonds as they were earned and paid. Another such fund was the BRF, which was to be secured by a letter of credit or a cash deposit by the Debtor and was to be used to replace any deficiency in payment of the proceeds on the bonds. The TI provides that

> [m]oneys and investments in the various funds created under or pursuant to this Article [creating both the BF and the BRF] shall, until applied as provided with respect to the fund in question, be held in trust by [UJB] for the benefit of the holders of all Outstanding Bonds, subject to the prior right of certain bondholders to moneys held in any sinking fund account established for such Bonds.

5. Exhibits entered into evidence at trial indicate that the amount presently on deposit with UJB in the BF is $426,032.35 and the amount on deposit with UJB in the BRF is $1,290,390.91.

6. Dr. Nicholas Canuso, the managing general partner and a limited partner of the Debtor, testified that the BRF was presently funded by a loan obtained by the Debtor from La Margate Corporation, an entity owned solely by him. He also testified that, while the Debtor had remained current in its payments on the Bonds through the date of the filing of this case, it ceased making payments thereafter.

7. Pursuant to the terms of both the TI and the ISA, the Facility had to be covered by hazard insurance against loss and/or damage. In addition, the proceeds from the policy or policies were to be made payable to UJB, which had sole right to receipt of the proceeds of, and to the claims under, the policy or policies. The ISA requires, further, that the Debtor "employ each year during the term of [the ISA] an Insurance Consultant ["the IC"]." BCA served as the IC under the ISA.

8. The TI also required that the subject insurance policies

> shall not be cancellable without at least 30 days' written notice to [UJB] and shall provide that all losses thereunder shall be payable to [UJB] notwithstanding any act or neglect of [PAID] or [the Debtor] which might otherwise result in a forfeiture of such insurance.

9. On May 3, 1987, the Debtor first acquired insurance on the Facility from PMMI. The annual policy was renewed on the same terms on May 3, 1988.

10. In late 1988 or early 1989, the reinsurer of the policies first discovered that the Facility was vacant and that the Debtor

---

1. PAID has not answered or appeared in the proceeding or on the motion in issue.

had filed a petition of bankruptcy, and it so notified PMMI. As a result, PMMI sent a notice of non-renewal of its policy to the Debtor on March 3, 1989.

11. Nevertheless, thereafter, PMMI entered into negotiations with BCA for a new insurance policy. Ultimately, new policy terms were negotiated. The terms of the new 1990 Policy included an increase in premiums, a higher deductible limit, and the imposition of specific requirements relating to the security of the Facility.

12. The 1990 Policy, issued on May 16, 1989, was effective as of May 3, 1989, and was hence in effect as of December, 1989, the date of the vandalization of the Facility. Critically, the 1990 Policy deleted UJB as an insured party, contrary to the terms of the prior insurance policies issued by PMMI in reference to the Facility.

13. Richard Rein, a senior vice president of UJB ("Rein"), testified that UJB was appointed to serve as trustee and paying agent for the bond financing which underwrote the construction, acquisition, and outfitting of the Facility in 1983. Rein identified the pertinent sections in the ISA and the TI which reflected the assignment of rights and interests to UJB by PAID and referenced provisions in each which required that all policies of insurance were to be for the benefit of PAID, the Debtor, and UJB, with regard to their respective interests, and that all policies of insurance were to be made payable to UJB, who would have the exclusive right to receive the proceeds from such policies.

14. Rein further identified UJB's inclusion as mortgagee on the policies for the two terms prior to the term of the 1990 Policy, and referenced paragraphs in the policies which stated that a mortgagee's interest in the policy could be cancelled only by giving the mortgagee ten days notice. He testified that UJB did not receive the requisite written notice from PMMI that it was being deleted as mortgagee on the insurance policies. However, he did admit that UJB received the March 3, 1989, notice of cancellation of the prior policy. He stated that, upon receipt of this notice, UJB worked with "other parties in the proceeding" to secure replacement insurance. He indicated that he was aware only that the Debtor had secured another policy through PMMI with slightly different terms than the prior policy, not that UJB had been deleted therefrom.

15. Gary Mauger ("Mauger"), a customer representative at BCA at the time of the issuance of the 1990 Policy, testified that his responsibility, with regard to insurance for the Debtor, was negotiating the terms of the new policy with PMMI and reviewing the policy when BCA received it from PMMI. He stated that his review including checking the policy against the application of the prospective insured and examining the Policy for correctness of such items as the premium quoted, the identity of the named insured, the limits of coverage, and the name of the mortgagee.

16. With regard to the 1990 Policy, Mauger admitted that, possibly because of confusion generated by his imminent departure from BCA, he mistakenly failed to notice the deletion of UJB as an insured party on the 1990 Policy. However, Mauger was very convincing in his firm denial that he ever requested the deletion of UJB from the 1990 Policy. Mauger stated that, had he requested the deletion of UJB, he would have written a note to the insurance file of the Debtor, as well as a confirming note to Richard Westbrook ("Westbrook"), the employee of PMMI with whom he dealt with directly. Mauger testified that he did not find any such item in a review of his notes.

17. Herbert Cutler ("Cutler"), an executive vice president of BCA, testified that he had all of the direct contacts with the Debtor and passed all of the Debtor's instructions to Mauger, who alone negotiated with PMMI. Cutler stated that he had not received any instructions from the Debtor to delete UJB as an insured party on the policy, that there was nothing in BCA's files indicating such communications, and that he had therefore not passed along to Mauger any instructions regarding such a deletion. Cutler admitted that, although he had no discussion with anyone at PMMI regarding UJB's deletion, he would have

delegated all such negotiations of the terms and conditions of the 1990 Policy to Mauger.

18. Fritz, offered as an expert on the customs and practices of the insurance industry, over PMMI's objection, *see* page 947 *supra*, testified that, while every insurance company has its own specific policies with regard to the addition or deletion of parties which have an interest in an insurance policy, no insurance companies accept only oral directives for the addition or removal of a mortgagee as an insured party. Fritz stated that such an action was taken only upon receipt of a directive in writing. Fritz conceded that this testimony was not based on any government code or regulation. However, his testimony relating to the general practices of insurance companies, such as PMMI's was convincing.

19. The principal witness called by PMMI was Westbrook, the underwriting manager of PMMI's commercial insurance department. Westbrook stated that, on April 27, 1989, Mauger wrote to him and advised that the terms and conditions which PMMI had previously demanded to continue coverage had been met, and that, as of May 10, 1989, after receiving approval of same from the reinsurer on the Policy, he directed the "central file" of PMMI to prepare a new policy with the changes included.

20. However, Westbrook further testified that, although he was unable to recall Mauger's exact words, on May 15, 1989, he received a telephone call from Mauger directing him to delete the mortgagee and the loss payee from the 1990 Policy. After writing a handwritten memo to himself on this matter, Westbrook contacted the "central file" at PMMI again, which amended the policy by deleting the mortgagee and the loss payee therefrom. On May 15, 1990, the 1990 Policy, with UJB deleted as an insured party, was printed and mailed to BCA.

21. Westbrook acknowledged that it would not have made any difference to PMMI, in rates or otherwise, if UJB *had* been included as an insured party in the policy, as PMMI had been prepared to issue the 1990 Policy with UJB included as an insured party prior to Mauger's call of May 15, 1990. Westbrook claimed, on cross-examination, that PMMI makes "a lot" of changes in insurance policies which are not confirmed in writing. He agreed that PMMI had made no special efforts to notify UJB that it was being removed as mortgagee.

22. We refuse to credit Westbrook's testimony regarding his receipt of a telephone call of May 15, 1989, from Mauger to delete UJB as an insured party. Westbrook was vague about the exact substance of this communication and there was no extrinsic evidence or testimony to support its occurrence. His demeanor on the stand revealed discomfort and did not support the conclusion that he was being truthful. Furthermore, had Mauger made such a communication, it would have been a mistake on Mauger's part, and its occurrence would have been inconsistent with not only Mauger's own testimony, but the lack of directives from Cutler or, in turn, the Debtor or any other party. Making such a change on oral instruction would also have been contrary to the general practices of the insurance industry per Fritz, whose testimony Westbrook unconvincingly attempted to rebut. We therefore conclude that Westbrook was principally at fault for the mistake of deleting UJB as an insured party from the 1990 Policy.

## D. DISCUSSION

1. UJB IS ENTITLED TO REFORM THE 1990 POLICY TO INCLUDE ITS COVERAGE AS AN INSURED PARTY THEREIN, SINCE THE MISTAKE CAUSING IT TO BE DELETED WAS PRINCIPALLY PMMI'S FAULT AND PMMI WOULD CLEARLY HAVE AGREED TO UJB'S INCLUSION AS AN INSURED PARTY BUT FOR ITS OWN MISTAKE IN DELETING IT.

Although the Briefs of UJB and PMMI are voluminous, the arguments are presented therein in a curious fashion. In its

Amended Complaint, UJB recites four counts: (1) equitable estoppel against PMMI to deny its coverage; (2) a right to reformation to include it as an insured party due to a mistake in deleting it; (3) failure of PMMI to notify UJB of the cancellation of the policy as to it; and (4) assertion of an equitable lien against the proceeds.

In its post-trial Brief, UJB devotes considerable attention to the third and fourth counts referenced above and then proceeds to argue at length its right to the proceeds contained in the BF and BRF. This presentation appears oblivious to our ruling that the bond fund issues were not properly the subject matter of the adversary proceeding, and it emphasizes two issues which do not include the strongest argument available to it.

Meanwhile, PMMI, despite UJB's failure to present argument on the issue, addresses at length the issue of whether the mistake(s) in issue justified reformation and secondarily discusses the equitable estoppel issue. Only the Trustee responds to UJB's arguments regarding the equitable lien theory, and then devotes the remainder of his Brief to argument regarding the disposition of the bond funds. The November 23, 1990, Briefs of both UJB and the Trustee on the bond fund issues are hence a reprise of their prior arguments.

As in the early stages of this proceeding, when UJB limited its claims to its potential rights under the 1990 Policy without regard to PMMI's actual potential liability under that Policy, and PMMI argued vigorously that, despite UJB's framing of the issues, its liability under the Policy was what *must* initially be at issue, the parties proceeded like the proverbial ships passing in the night. Each argued what it wished without regard to the indications of the court as to what it deemed appropriate and without any apparent compunction about rebutting the arguments and issues raised by the other parties.

In retrospect, we believe that PMMI's concern about the claim of UJB for reformation due to a mistake in the formation of the 1990 Policy was well-placed. This is clearly UJB's strongest argument and it is the one upon which we initially decide that it must prevail.

■ Our starting point is the observation, not opposed by PMMI, that UJB, although not the insured, need not be the insured to exercise contractual rights under the 1990 Policy. There is a long line of Pennsylvania decisions which hold that "the so-called standard mortgage clause ... creates in favor of the mortgagee a contract of insurance separate, distinct and independent from that constituted between the mortgagor and the insuring company by the other provisions of the insurance policy...." *Overholt v. Reliance Insurance Co.*, 319 Pa. 340, 342, 179 A. 554, 556 (1935). *See also Beaver Falls Building & Loan Ass'n v. Allemania Fire Ins. Co.*, 101 Pa.Super. 109, 113, *rev'd on other grounds*, 305 Pa. 290, 157 A. 616 (1931); and *Knights of St. Joseph Building & Loan Ass'n v. Mechanics' Fire Ins. Co.*, 66 Pa.Super. 90, 94 (1917). Thus, with regards to the 1990 Policy, there existed two insurance contracts which protected two independent interests: one between PMMI and the Debtor *and* one between PMMI and UJB.

Furthermore, Pennsylvania law provides that UJB has rights as a third-party beneficiary under the 1990 Policy entitling UJB to seek reformation this contract because it is a party in privity to the insured party on the Policy. *See Lachner v. Swanson*, 251 Pa.Super. 561, 566, 380 A.2d 922, 925 (1977). In *In re Mirkin*, 100 B.R. 221, 226 (Bankr.E.D.Pa.1989), we recognized that third-party beneficiary status arises where

(1) the parties to a contract intend to provide rights to the third party, and (2)(a) the performance satisfies an obligation of the promise to pay money to the beneficiary, or (b) the circumstances indicate that the promisee intended to give the beneficiary such rights.

In the present controversy, the evidence unequivocally indicates that, pursuant to the ISA and the TI, UJB was given the right to receive the proceeds from any insurance policy on the Facility and all insurance policies were to be made payable to UJB. As a result, UJB was named mort-

gagee in all insurance policies issued prior to the 1990 Policy, and it was clearly intended that the prior policies permitted it to exercise such rights. Therefore, we conclude that UJB can appropriately seek to reform the 1990 Policy.

■ A crucial and disputed factual issue in this proceeding is determining what mistake or mistakes were made by whom. Our Findings of Fact 15–22, at pages 949–950 *supra*, settle most of these issues. We find, without any reservation, that the major cause of the failure of the 1990 Policy to ˙recite the intended retention of UJB as an insured party was Westbrook's erroneous and unwarranted act of deleting UJB's insured status from the 1990 Policy. We have not found that this mistake was knowing, intention, or malicious. However, the complete failure of Westbrook to support his weak testimony with extrinsic evidence and his unconvincing demeanor on the stand *could*, if necessary, possibly support the conclusion that the deletion of UJB was at least reckless conduct on his part. We disbelieve not only Westbrook's recitation of the receipt of the call of May 15, 1989, from Mauger, but his denial that such an important change on a large policy insuring a party then known to be a bankrupt and no longer doing business would have been required to have been made in writing. Since Westbrook was clearly its agent and servant in this matter, the responsibility for his mistakes can be imputed to PMMI.

Of course, PMMI's action would have been of only minor consequence if Mauger had not mistakenly failed to carefully check the insurance policy upon its receipt, as was his duty. Mauger's mistake was compounded by the failure of any of the learned parties and counsel involved in this case to carefully check the terms of the Policy. Therefore, the consequent deletion of UJB as an insured party in the 1990 Policy was the result of mistakes on the part of both PMMI and BCA, as well as those of other parties acting on behalf of the Debtor and/or UJB. However, the most serious mistake was that of Westbrook, acting on behalf of PMMI.

■ The principal argument of PMMI on this issue is that a contract can be reformed only upon a showing of a mutual mistake, or of a unilateral mistake accompanied by fraud on the part of the party not mistaken. Unfortunately for PMMI, its analysis is colored by its contention that the party primarily responsible for the mistake in issue was Mauger, who PMMI quite predictably argues in fact made the disputed telephone call of May 15, 1989, to Westbrook. PMMI then argues that, since Mauger (and BCA) were agents of the Debtor, and UJB is in privity with the Debtor, BCA's mistakes are attributable to the Debtor and UJB.

We will assume, with PMMI, that BCA was the agent of the Debtor and UJB. *See Rich Maid Kitchens, Inc. v. Pennsylvania Lumbermen's Mutual Ins. Co.*, 641 F.Supp. 297, 303 (E.D.Pa.1986); and *Taylor v. Crowe*, 444 Pa. 471, 475, 282 A.2d 682, 683 (1971). This finding is supported by BCA's status as the IC in the ISA. In its Brief, UJB does not contest the status of BCA as the agent of it and the Debtor. When we were unsure as to who was at fault in the erroneous sequence of communications between Mauger and Westbrook which led to UJB's deletion, as was the case when we prepared our Memorandum of September 14, 1990, this agency-law issue was significant. Its significance is lost now that we find that PMMI, and not BCA, is primarily responsible for the erroneous communications.

■ It is clear that even a unilateral mistake by one party may render a contract voidable as to the party causing the mistake. RESTATEMENT (SECOND) OF CONTRACTS, § 153(b), at 394 (1981) ("the Restatement"). It is also clear that a mutual mistake will justify reformation if there is "some agreement between the parties prior to the writing ... complete and certain enough to be a contract." *Id.*, § 155 and Comment *a* thereto, at 406–07. Finally, the Restatement notes that the risk of a mistake may be allocated to a particular party "on the ground that it is reasonable in the circumstances to do so." *Id.*, § 154(c), at 403.

Here, there was, prior to the purported call from Mauger to Westbrook on May 25, 1989, a certain and complete agreement that PMMI would write a policy with the same terms as the ultimate 1990 Policy, but with UJB included as an insured party. It is perfectly reasonable to allocate the risk of mistake to PMMI. Finally, it is neither onerous nor unfair to PMMI to reform the 1990 Policy to add UJB as an insured party.

There is some question as to whether the mistake in issue was truly mutual. Westbrook, for PMMI, made a mistake in deleting UJB; Mauger, for the Debtor and UJB, made a mistake in failing to observe the deletion. Both were hence guilty of mistakes. It could therefore be argued that there were mutual mistakes here such as would indisputably justify reformation under the terms of the Restatement.

However, it must be conceded that the mistakes of Westbrook and of Mauger were not the same mistake, and, therefore, were not mutual in that respect. We must confess, however, that it would make little sense to deny UJB the remedy of reformation simply because the principal mistake was solely that of PMMI.

The analysis included in 3 A. CORBIN, CORBIN ON CONTRACTS, §§ 608, 614, at 669–70, 723–32 (1960) ("Corbin"), on this topic is helpful. Corbin thusly criticizes statements by courts that the mutuality of a mistake is crucially significant in determining the appropriate relief on account of a mistake:

Statements are exceedingly common, both in texts and in court opinions, that relief will not be given on the ground of mistake unless the mistake is "mutual." Such a broad generalization is misleading and untrue.

.    .    .    .    .

... Reformation is often refused on the ground that the mistake was not "mutual," when the correct reason is that the parties never agreed upon any terms other than those in the erroneous writing.

*Id.*, § 608, at 669–70.

Instead, Corbin observes that reformation

is a remedy the purpose of which is to make a mistaken writing conform to antecedent expressions on which the parties agreed. These antecedent expressions of agreement may have been such as to constitute a valid informal contract, in which case reformation is merely a step in the enforcement of that contract.

*Id.*, § 614, at 723. Pertinent to the instant facts involving an insurance contract are the following observations:

Insurance policies are now very commonly executed in a standardized form with many already printed provisions. In making such a contract it is very easy to forget to strike out one of those provisions, even though it was clearly agreed that the insurance contract should contain no such term. By a decree for reformation, the provision will be ordered stricken out, or the insurance contract will be enforced by the decree as if the provision had never been there.

Reformation may be a proper remedy even though the mistake is not mutual.

*Id.* at 729–30 (footnotes omitted).

Pertinent to the failure of Mauger or anyone on behalf of the Debtor or UJB to discover the deletion is Corbin's observation that the fact that the insured "was negligent in failing to observe that the writing does not express what he has assented to does not deprive him of this [reformation] remedy; ... (footnote omitted)." *Id.* at 731.

■ The principle that insurance contracts are particularly apt candidates for reformation, in circumstances where that remedy would merely add a term to which the insurer would clearly have agreed but for its mistake in deleting same is also thusly sounded in 13 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS, § 1568A, at 380 (3d ed. W. Jaeger 1979):

Although the statement is frequently made that insurance policies are to be interpreted like other contracts, there seems little doubt that if there is any ambiguity, even slight, or any mistake of

a mutual nature, the courts are more inclined to resolve the ambiguity against the insurer, or to reform the policy according to the understanding reasonably acquired by the insured (footnotes omitted).

In this regard, this court thusly held to the same effect in *In re Leedy Mortgage Co.*, 76 B.R. 440, 446 (Bankr.E.D.Pa.1987): the law of Pennsylvania, as interpreted by the state courts and the federal courts in deciding cases involving insurance coverage, is that

> "because insurance policies are frequently considered to be contracts of adhesion, any ambiguity in the policy *'must* be construed against the insurer, and in a manner which is more favorable to coverage.' *Houghton v. American Guar. Life Ins. Co.*, 692 F.2d 289, 291 (3d Cir.1982) (*quoting Buntin v. Continental Ins. Co.*, 583 F.2d 1201, 1207 [3d Cir.1978])."

*See also, e.g., Niagara Fire Ins. Co. v. Pepicelli, Pepicelli, Watts & Youngs, P.C.*, 821 F.2d 216, 220 (3d Cir., 1987); *Shisko v. State Farm Ins. Co.*, 553 F.Supp. 308, 312 (E.D.Pa.1982); *Wierbinski v. State Farm Mut. Auto. Ins. Co.*, 477 F.Supp. 659, 662 (W.D.Pa.1979); and *Weiss v. CNA*, 468 F.Supp. 1291, 1293 (W.D.Pa.1979). In decisions such as *Ranieli v. Mutual Life Ins. Co.*, 271 Pa.Super. 261, 413 A.2d 396, 400 (1979), the state courts have held that "it is well settled that insurance policies are in essence contracts of adhesion, and consequently, any ambiguities or uncertainties in language are construed strictly against the insurer and in favor of coverage." Furthermore, considerable Pennsylvania law, as interpreted by the federal as well as state courts, establishes that unless an insurer can prove that the insured was aware of the policy's exclusions and limitations, at least by means of receipt of the policy, the exclusions and limitations can be found ineffectual. *See, e.g., Daburlos v. Commercial Ins. Co.*, 521 F.2d 18, 24 (3d Cir.1975); *Williams v. Nationwide Ins. Co.*, 571 F.Supp. 414, 416–17 (M.D.Pa.1983); *Nationwide Mut. Ins. Co. v. United States*

*Fid. & Guar. Co.*, 529 F.Supp. 194, 200–03 (E.D.Pa.1981); [*Cornwell v. State Farm Fire & Cas. Co.*, 527 F.Supp. 310, 312–13 (E.D.Pa.1981)]; and *Mattes v. National Fidelity Life Ins. Co.*, 506 F.Supp. 955, 958–61 (M.D.Pa.1980), *aff'd*, 659 F.2d 1069 (3d Cir.1981), *cert. denied*, 454 U.S. 966, 102 S.Ct. 509, 70 L.Ed.2d 383 (1981).

The analysis presented in the foregoing authorities is clearly applicable to the instant controversy. The mistake committed by Westbrook resulted in a contract which erroneously excluded UJB as an insured party. However, the contract, with the addition of UJB, would have consisted of the precise terms to which Westbrook and Mauger had indisputably agreed a few days before. Given that the instant contract is one of insurance, there is ample basis to reform the contract to provide for the coverage to which the parties actually agreed.

The result reached by us here is consistent with that reached in several cases decided under Pennsylvania law. In *Bugen v. New York Life Ins. Co.*, 408 Pa. 472, 184 A.2d 499 (1962), the court reformed an insurance contract to change the beneficiary to the insured's wife after it was established that, due to the insurer's unilateral error in draftsmanship, the insured's uncle was so named. Similarly, in *Overholt, supra,* the insurer mistakenly changed a "standard mortgage clause" to a "loss-payable clause." In reforming the insurance contract to include a "standard mortgage clause," the court observed that this change was significant because a "loss-payable clause" would subject the mortgagee to the insurer's defenses against the insured, while a "standard mortgage clause" would not. 319 Pa. at 342, 179 A. at 556. The effect of the addition of UJB as an insured under the 1990 Policy would therefore have an effect very like that of the reformation ordered in *Overholt. See also, e.g., Special Jet Services, Inc. v. Federal Insurance Co.*, 643 F.2d 977 (3d Cir.1981) (exclusion of coverage in flights in which pilot of plane was not accompanied by a co-pilot not enforced); *Line Lexington*

*Lumber & Millwork Co. v. Pennsylvania Publishing Co.*, 451 Pa. 154, 301 A.2d 684 (1973) (omission of owner of building as insured party reformed); and *General Electric Credit Corp. v. Aetna Casualty & Surety Co.*, 437 Pa. 463, 263 A.2d 448 (1970) (erroneous provision of derivative coverage as opposed to primary coverage to secured seller of restaurant equipment deleted in two contracts).

We therefore conclude that UJB is entitled to reformation of the 1990 Policy to add it as an insured party on the ground that it was excluded by mutual mistake, or by a unilateral mistake which was the fault of the party charged, since it would have clearly been included as an insured party but for the mistake.

2. ALTHOUGH UJB MAY HAVE FAILED TO PROPERLY PERFECT ITS SECURITY INTEREST IN THE INSURANCE PROCEEDS, IT IS ENTITLED TO ASSERT AN EQUITABLE LIEN IN REFERENCE TO SAME AS TO PMMI.

Our resolution in favor of UJB on the second (reformation) count of its Complaint renders extended discussion of the other counts of lesser significance. However, as the fourth count (equitable lien) implicates the rights of UJB to the insurance proceeds vis-a-vis the Trustee, some discussion of this claim is required.

■ For an equitable lien to arise "there must be an obligation owing by one person to another, a *res* to which that obligation attaches, and an intent by all parties that the property serve as a security for the payment of the obligation." *Mermon v. Mermon*, 257 Pa.Super. 228, 235–36, 390 A.2d 796, 799–800 (1978). *See also R.M. Shoemaker Co. v. Southeastern PA. Development Corp.*, 275 Pa.Super. 594, 601, 419 A.2d 60, 63 (1980). To establish its right to an equitable lien upon the insurance proceeds, UJB must prove by clear and precise evidence that it and the Debtor desired that the Facility serve as security for the Bonds and, in support of that intention, that both intended that UJB be listed as a mortgagee on the 1990 Policy. *Mermon*, 257 Pa.Super. at 235, 390 A.2d at 796.

■ Typically, courts look to the existence of an agreement or to the attendant circumstances to determine whether an equitable lien arises. *Id. See also In re Burnley Workshop of the Poconos, Inc.*, 59 B.R. 969, 972 (M.D.Pa.1985). Merely lending money "does not itself give the lender a lien" and " 'in the absence of an intention to create it, an equitable lien will not arise in favor of one who advances money to pay the purchase price of realty.' " *Mermon*, 257 Pa.Super. at 236, 390 A.2d at 800, quoting 51 AM.JUR. 2d 172 (1970). Further,

> "[a]s a general rule, if the mortgagor covenants to keep the mortgaged premises insured for the better security of the [mortgagee], the latter will have an equitable lien upon the proceeds of insurance carried by the mortgagor in case of a loss, to the extent of his interest in the property destroyed, even though a policy contains no mortgage clause and is payable to the mortgagor."

*Laurel Nat'l Bank v. Mutual Benefit Ins. Co.*, 297 Pa.Super. 473, 482–83 n. 1, 444 A.2d 130, 135 n. 1 (1982), quoting 5 G. COUCH, INSURANCE 2d § 29:82 (1960).

■ In the present controversy, we find that an UJB has an equitable lien on the Facility, as it relates to its rights to recover the insurance proceeds from PMMI. In order to secure the Bonds which underwrote the acquisition, construction, and equipping of the Facility, the Debtor mortgaged and pledged the Facility to UJB. To protect its interest in the Facility, UJB filed financing statements, and it was required in the ISA and the TI that the Debtor carry insurance on the Facility which named UJB as mortgagee. Thus, in accordance with the terms of the ISA and the TI, the Debtor was required to insure the Facility with an insurance policy, or policies, which named UJB as mortgagee, in order to further secure the debt created by insurance of the Bonds.

The purpose of naming UJB as mortgagee was to guarantee that, if the Facility were destroyed or severely damaged, UJB

would receive the proceeds from the insurance policy and, thus, protect the interests of the bondholders *and* fulfill the Debtor's obligation to further secure the Bonds. As a result, in line with the second requirement for an equitable lien, the *res* to which the obligation attaches is the insurance proceeds. Such insurance proceeds, if they are ever made payable to PMMI, will be easily traceable to it. The intention that the Facility serve as security for the payment of the Bonds is evidenced by the descriptions on financing statements attached as exhibits to the Complaint. Thus, all three elements for the presence of an equitable lien appear to be present, such as would support a finding that UJB possesses an equitable lien sufficient to protect its insurable interest in the insurance proceeds, despite its deletion from the 1990 Policy.

However, in the midst of the present controversy between UJB and PMMI, the Trustee raises the issue as to whether UJB effected continuous perfection of its security interest in the insurance proceeds. As a result, the Trustee questions whether UJB has a valid equitable lien in the insurance proceeds sufficient to give it priority over his interests in those proceeds.

During the trial, the Trustee raised the issue of whether the documents purporting to be the continuation statements were filed within the requisite five-year period. *See* 13 Pa.C.S. §§ 9403(b), 9403(c); and *Heights v. Citizens Nat'l Bank*, 463 Pa. 48, 342 A.2d 738 (1975).

Rein testified that the continuation statements were filed "a month or two" prior to the expiration of the original financing statements. However, an examination of the copies of financing statements and the continuation statements in the instant record fails to conclusively establish that the continuation statements were filed within five years of the original financing statements. The original financing statements appear to have been filed on March 11, 1983, and March 14, 1983. A review of the various continuation statements indicate that they appear to have been filed on March 22, 1988, March 29, 1988, and April 6, 1988, more than five years after the filing date of the financing statements.

UJB counters the Trustee's argument with the contention that its recording of an unsatisfied real estate mortgage rendered the filing of the continuation statements unnecessary for it to retain its security interest in the insurance proceeds vis-a-vis the Trustee. The Trustee responds that only a real estate mortgage "which is effective as a fixture filing under section [13 Pa.C.S.] 9403(f)" remains effective as a fixture filing until the mortgage is satisfied: It is unclear whether UJB ever made a "fixture filing" of its mortgage.

We believe that the focus of UJB and the Trustee on the issue of UJB's rights as an insured party under the insurance policy with PMMI have rendered the evidence on the issue of their relative priority to the potential insurance proceeds very murky. We are reluctant to decide this issue on this record at this point, especially since no insurance proceeds even exist at the present and thus the issue may well be a hypothetical one. We will only decide the issue of UJB's security interest in the insurance proceeds as it relates to UJB's assertion of an equitable lien theory to support its rights to recover on the policy as to PMMI.

Furthermore, the significance of a perfected security interest has not always been held to have been dependent upon the existence of a valid equitable lien as the result of a contest in priority between parties with interests in the same *res*. Therefore, in the instant adversary proceeding, the outcome of the contest between UJB and the Trustee may not be decisive of UJB's right to claim an equitable lien in the insurance proceeds as to PMMI. To be sure, some courts have not upheld equitable liens "where all available means of perfecting a lien were not employed," i.e., where the party seeking an equitable lien has not perfected its security interest. *Burnley Workshop, supra,* 59 B.R. at 971; *In re Rutherford,* 73 B.R. 665, 668–69 (Bankr.W.D.Mo.1986); and *In re O.P.M. Leasing Services Co.,* 23 B.R. 104, 119 (Bankr.S.D.N.Y.1982). However, other

courts have found that, even when the existence of an equitable lien had been previously established as to other parties, a trustee or debtor-in-possession may later establish a superior priority to the lienholder as a result of the failure of the security party to perfect its security interest. *In re Terra Villa Apartments, Ltd.*, 101 B.R. 755, 759 (Bankr.N.D.Fla.1989); and *In re Allenwear & Associates*, 89 B.R. 531, 532–33 (Bankr.E.D.Pa.1988). Still other courts have found that an equitable lienholder has superior priority to insurance proceeds, despite its omission from an insurance policy as mortgagee or loss payee, because it perfected its security interest or it was previously recognized by a court as being a secured creditor. *In re Atcorp I, Inc.*, 25 B.R. 340, 341 (Bankr. 1st Cir.1982); and *In re Moore*, 54 B.R. 781, 784 (Bankr.W.D.Mo. 1985).

Here, we are uncertain whether UJB has in fact retained its perfected security interest in the insurance proceeds and therefore whether it can assert a perfected security interest as against the Trustee. However, we do not believe that this uncertainty should prevent our holding in favor of UJB as against PMMI on its equitable lien theory, as an alternative basis to the decision in favor of UJB on the ground of mistake.

3. UJB'S CONTENTIONS THAT (1) IT FAILED TO RECEIVE ADEQUATE NOTICE OF THE CANCELLATION OF ITS INSURED INTEREST, AND (2) THAT PMMI IS EQUITABLY ESTOPPED TO DENY COVERAGE TO IT CANNOT BE SUSTAINED.

Having ruled in favor of UJB on two of its proffered theories to establish its status as an insured party on the 1990 Policy, we need not give much treatment to UJB's other alternative, less successful theories. ▆ We are unpersuaded by UJB's contention that the 1990 Policy must be reformed to reflect its position as mortgagee of the insurance policy covering the Facility on the ground that PMMI failed to provide notice of "cancellation" of insurance coverage. In this court's foregoing discussion on reformation, we acknowledged the existence of two separate, independent contracts in the instance where a standard mortgagee clause is inserted into an insurance policy. *See* pages 951–952 *supra.* We also acknowledge, that, where the mortgagee is entitled to notice of cancellation, the absence of such cancellation is in derogation of the separate and distinct contract existing between the insurer and the mortgagee.

However, we do not acknowledge that PMMI's notice of non-renewal of insurance coverage on the Facility failed to properly put UJB on notice that it would lose its insurable interest upon the expiration of the May, 1988—May, 1989 policy ("the 1989 Policy"). There was no cancellation of the 1989 Policy. Therefore, the notice properly did not indicate the cancellation of a policy.

UJB's argument to the contrary fails to appreciate the distinction between non-renewal of an insurance policy and cancellation of an insurance policy. A "cancellation is the termination of a policy *prior* to its expiration arising from the acts of one of the parties." 17 G. COUCH, INSURANCE 2d, § 67:1, at 462 (rev. ed. R. Anderson, M. Rhodes 1983) (emphasis added). Typically, cancellation clauses permit termination at any time, upon notice. *See In re Heaven Sent, Ltd.*, 50 B.R. 636, 637 n. 2 (Bankr.E.D.Pa.1985); *Federal Kemper Ins. Co. v. Commonwealth of PA., Ins. Dep't.*, 509 Pa. 1, 3 n. 2, 500 A.2d 796, 797 n. 2 (1985); *Coppola v. Insurance Placement Facility*, 386 Pa.Super. 413, 415, 563 A.2d 134, 135 (1990); and *DeMauro v. Hartford Fire Ins.*, 20 Pa.D. & C. 3d 553, 555 (Lawrence Co. C.P. 1979). In contrast, the non-renewal of an insurance policy is the act of "failing to renew a policy which has ceased to exist or which thereupon ceases to exist" due solely to expiration of a period of insurance coverage. 18 G. COUCH, *supra,* § 68:6, at 7. *See also Federal Kemper, supra,* 509 Pa. at 3 n. 2, 500 A.2d at 797 n. 2. Thus, UJB's argument that it failed to receive a requisite notice of cancellation of the policy is misplaced. UJB had received, appropriately, the requisite notice of non-renewal of cov-

erage of its insurable interest. This was the only notice required.

■ UJB also contends that PMMI should be equitably estopped from denying coverage to it. In *In re Webb,* 99 B.R. 283, 290 (Bankr.E.D.Pa.1989), we thusly described the elements of equitable estoppel:

The most comprehensive statement that we could find regarding the elements of equitable estoppel is the following, appearing at 28 AM.JUR.2d, *supra,* at 640–41 [1966]:

"Broadly speaking, the essential elements of an equitable estoppel or estoppel in pais, as related to the party to be estopped, are (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; and (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. And, broadly speaking, as related to the party claiming the estoppel the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice (footnotes omitted)."

*See also, e.g., Heckler v. Community Health Services of Crawford County,* 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984); *United States v. Asmar,* 827 F.2d 907, 912 (3d Cir.1987); *Santos v. Franklin,* 493 F.Supp. 847, 853 (E.D.Pa.1980); *GAF Corp. v. Amchem Products, Inc.,* 399 F.Supp. 647, 657–59 (E.D.Pa.1975), *rev'd on other grounds,* 570 F.2d 457 (3d Cir.1978); *[In re Franks,* 95 B.R. [346,] at 353–54 [Bankr.

E.D.Pa.1989]; and 14 P.L.E., *supra,* at 189–91 [1959].

The elements lacking here are evidence that Westbrook, acting for PMMI, intended or expected UJB to act upon his conduct, and that Westbrook knew the real fact that UJB should not have been deleted from the policy. We thus do not find that the pertinent evidence is sufficient to allow us to conclude that PMMI knowingly caused the 1990 Policy "to fail to embody the intent of the other party [the Debtor]," as was found in *Line Lexington, supra,* at 451 Pa. at 160, 301 A.2d at 687. Only where an intentional action is proven to have caused the mistake in the policy to have occurred would PMMI be estopped from denying UJB coverage under the 1990 Policy. *Id.,* 451 Pa. at 160–61, 301 A.2d at 687–88. In *Line Lexington,* as in *General Electric Credit, supra,* the courts found that agents of the insurers knew of the coverage not provided in the policies, and imputed the agents' knowledge to the respective insurers. Here, as UJB itself now concedes, BCA was not the agent of PMMI, and BCA, acting as agent, was not, as in these cases, primarily responsible for the mistake made. This proceeding is therefore quite easily distinguishable from *Line Lexington* and *General Electric Credit* on several bases and we readily can conclude that equitable estoppel will not lie here.

4. UJB WILL BE GRANTED RELIEF FROM THE AUTOMATIC STAY TO PURSUE THE SUMS IN THE BRF, AS WELL AS THE SUMS IN THE BF, BECAUSE THE DEBTOR'S INTEREST IN THE BRF IS MERELY THAT OF THE SETTLOR OF A TRUST.

The final issue addressed in this Opinion, which is only loosely related to the issue of UJB's status as an insured party on 1990 hazard insurance Policy on the Facility, is UJB's rights to distribute to the bondholders the funds which it is presently holding in the BF and BRF accounts.

The Trustee does not appear to contest UJB's right to take whatever action it deems appropriate as to the proceeds locat-

ed in the BF account. These proceeds apparently merely represent funds paid and payable to the bondholders which UJB had not distributed on the date of the bankruptcy filing, but of which the Trustee concedes that distribution to the bondholders would be proper.

The dispute centers on UJB's rights to the proceeds in the BRF account. These proceeds were in the nature of a security deposit made by the Debtor on behalf of the bondholders, to be utilized in the event that the Debtor defaulted on its bond-payment obligations. The Trustee points out that, had the payment obligations of the Debtor on the Bonds been fulfilled, the Debtor would have been entitled to the return of the proceeds in the BRF. Of course, since the bankruptcy filing over two years ago, the payments have not been made. Therefore, although no draw was made on the proceeds of the BRF in the past, such a draw may well be appropriate at this juncture.

UJB argues that the funds are held by it in an express trust, and that the funds are therefore not property of the Debtor's estate. We do not totally agree with this analysis. However, we do agree with UJB's first and ultimately more significant proposition that the creation of the BRF did constitute an express trust.

The most comprehensive definition of an express trust which we could locate appears as follows at 76 AM.JUR. 2d 279 (1975), where it is said that the elements of a trust

> include a competent settlor and a trustee, an ascertainable trust res, and sufficiently certain beneficiaries. Stilted formalities are unnecessary, but nevertheless each of the above-named elements is required to be established, and, if any one of them is missing, it is fatal to the trust.
>
> Furthermore, there must be a present and complete disposition of the trust property, notwithstanding that the enjoyment in the beneficiary will take place in the future. It is essential, too, that the purpose be an active one to prevent the trust from being executed into a legal estate or interest, and one that is not in contravention of some prohibition of statute or rule of public policy.
>
> There must also be some power of administration other than a mere duty to perform a contract although the contract is for a third-party beneficiary. A declaration of terms is essential, and these must be stated with reasonable certainty in order that the trustee may administer, and that the court, if called upon so to do, may enforce, the trust (footnotes omitted).

The holdings of the pertinent Pennsylvania cases are consistent with this statement of the definition of a trust. *See, e.g., Buchanan v. Brentwood Federal Savings & Loan Ass'n,* 457 Pa. 135, 143–55, 320 A.2d 117, 122–28 (1974); and *Thompson Will,* 416 Pa. 249, 254–55, 206 A.2d 21, 25 (1965).

It is well-established that the presence of the words "trust" or "in trust" are not necessary to form a trust, nor does the presence of those words automatically create one. *Buchanan v. Brentwood, supra,* 457 Pa. at 143–44, 320 A.2d at 122–23; and *Thompson, supra,* 416 Pa. at 255, 206 A.2d at 25. However, "neither are these words irrelevant or to be accorded no weight." *Buchanan v. Century Federal Savings & Loan Ass'n,* 374 Pa.Super. 1, 8, 542 A.2d 117, 121 (1988).

The "magic trust words" do appear in the TI, as noted in Finding of Fact 3, page 948 *supra.* There is a potential settlor (the Debtor), a trustee (UJB), and ascertainable and sufficiently certain beneficiaries (the bondholders). However, what we believe is most significant here is the complete divesture of the Debtor's property—the sums which Dr. Canuso testified were borrowed by him from La Margate Corporation and were paid over to the Trustee—into the hands of the Trustee for a very specific purpose—payment of deficiencies owing to the bondholders. There are also specific instructions included in the TI which it is UJB's duty to perform. We consider the formality of this disposition to be rather extraordinary and conclude that it distinguishes the relationship created between the Debtor and UJB from the ordinary debtor-creditor or principal-agent relation-

ship. *Compare Provident Trust Co. v. Lukens Steel Co.*, 359 Pa. 1, 7, 58 A.2d 23, 25–26 (1948) (in this case, heavily relied upon by the Trustee, the court found that the duties placed upon the putative trustee were a mere "suggestion or wish" and did not therefore constitute the imposition of an enforceable duty).

■ Despite this conclusion, we are not prepared to find that the proceeds in the BRF are not "property of the estate" of the Debtor. The term "property of the estate," pursuant to 11 U.S.C. § 541(a)(1), embraces "all legal or equitable interests of the debtor in property as of the commencement of the case" and is therefore very broad in scope. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983). *See also, e.g., In re Temp–Way Corp.*, 80 B.R. 699, 702 (Bankr.E.D.Pa. 1987); *In re Ford*, 78 B.R. 729, 735 (Bankr. E.D.Pa.1987); and *In re Mason*, 69 B.R. 876, 882–84 (Bankr.E.D.Pa.1987). The Debtor, as the settlor of the trust in issue, certainly has *some* legal or equitable interest in the BRF proceeds as of the commencement of the case.

The interest of the Debtor here in the BRF proceeds is comparable to that which the "debtor-settlor" had in the trust funds issue in *Begier v. Internal Revenue Service*, —— U.S. ——, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). In that case, the Court, invoking 11 U.S.C. § 541(d), found that the debtor's interests in the funds of which the Internal Revenue Service was a trust beneficiary was not "property of the debtor" as referenced in 11 U.S.C. § 547(b). However, the Court suggests, by the citation of § 541(d), that the Debtor had some interest in the trust *res* which was at least technically "property of the estate."

We utilized a similar analysis and invocation of § 541(d) in *In re Summit Airlines, Inc.*, 94 B.R. 367, 370 (Bankr.E.D.Pa.1988), *aff'd*, 102 B.R. 32 (E.D.Pa.1989); and *Temp–Way, supra,* 80 B.R. at 702. There, we held that, although the slight interests of the debtors in the funds in issue probably were within the broad scope of property of the respective debtors' estates, third parties were entitled to possession of the funds.

We therefore conclude that the funds in the BRF are property of the Debtor's estate, to which the protections of 11 U.S.C. §§ 362(a)(3), (a)(5), (a)(6) attach. However, we also conclude that, given the very significant interest of the bondholders in the funds in the BRF (as well as those funds contained in the BF); the slight interest of the Debtor therein as the mere settlor of a trust of which the funds are proceeds; and the lack of any offer of adequate protection of the bondholders' interest by the Debtor, *compare Ford, supra,* 78 B.R. at 735–37, granting the Trustee relief from the automatic stay to utilize these sums in the interests of the bondholders is warranted. We will so order.

E. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.

ORDER

AND NOW, this 5th day of December, 1990, upon consideration of the Motion of the United Jersey Bank ("UJB") for a Declaratory Judgment that the Automatic Stay Does Not Apply, or in the Alternative for Relief from the Stay for Cause in the above-entitled main bankruptcy case, and upon consideration of the above adversary proceeding, on the record established in the trial of the proceeding on September 17, 1990, and October 4, 1990, and upon careful review of the parties' voluminous post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. The policy of hazard insurance between the Debtor and Defendant PENNSYLVANIA MILLERS MUTUAL INSURANCE COMPANY extending from May, 1989, to May, 1990, shall be REFORMED to reflect that UJB is an insured party therein.

2. UJB is granted relief from the automatic stay to use the sums in the Bond Fund and the Bond Reserve Fund created in Article VI of the Trust Indenture of February 16, 1983, between UJB and De-

fendant PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT for the benefit of the bondholders, pursuant to the terms of that Indenture.