**In re ATLANTIC MARBLE, INC., Debtor.**

**Bankruptcy No. 90–14484S.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 3, 1991.

Eugene J. Malady, Media, Pa., for debtor.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

Susan Verbonitz, Philadelphia, Pa., for Provident Nat. Bank.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant contested matter presents the issue of whether the corporate Debtor retained ownership of certain equipment which was pledged by a successor corporate entity to a bank, thus rendering the Bank's alleged security interest in the equipment given by the successor a nullity. We find that the successor's possession of the equipment merely created a presumption of its ownership of same, which the Debtor's evidence rebutted. Therefore, we conclude that the Debtor remains the owner of the equipment and that the Bank has no valid security interest in it.

### B. PROCEDURAL AND FACTUAL HISTORY

ATLANTIC MARBLE, INC. ("the Debtor"), a manufacturer of synthetic marble products, filed the voluntary Chapter 11 bankruptcy case giving rise to the matter presently at issue on November 1, 1990. Easily the most significant event in the history of this case has been the filing of the instant Motion by Provident National Bank ("the Bank") to determine the extent of its security interest in the Debtor's alleged property and to obtain relief from the automatic stay to enforce its rights as to that property ("the Motion") on January 11, 1991. The Motion was originally listed for a hearing on February 6, 1991, but, when this court was unable to reach the hearing on that date, it was continued by agreement of the parties two times until we directed that it must be tried on April 10, 1991. At the close of the hearing on the latter date, we accorded the parties an opportunity to file opposing Briefs on or before April 19, 1991 (the Bank), and April 26, 1991 (the Debtor).

The only other noteworthy event in the history of the case was our entry of an Order of March 25, 1991, requiring the Debtor to file a Plan of Reorganization and an accompanying proposed Disclosure Statement on or before May 1, 1991. These matters have been timely filed.

At the hearing on the Motion, testimony was adduced from Steve Katzev ("Katzev"), half-owner (with his mother) and effectively the sole principal of the Debtor, and, more briefly, Orlando Esposito ("Esposito") a Vice–President of the Bank who approved the loan in issue on April 16, 1990. Katzev testified that, between approximately February, 1989, and May, 1989, he and his late father purchased certain equipment used for manufacturing cultured marble products in the Debtor's business. This equipment consisted primarily of molds, machinery and tools used to form marble bathroom vanities and sinks ("the Equipment").

For about a year after the purchase of the Equipment, the Debtor conducted its business from leased premises in Hatboro, Pennsylvania. One of the Debtor's largest customers was Cogan & Gordon ("Cogan"), a retail supplier of kitchen and bathroom sinks and vanities.

In early 1990, Katzev was approached by Lawrence Bunis ("Bunis"), whose father-in-law, Sidney Haifetz ("Haifetz"), is a principal of Cogan, with a proposal to form a new business which would, like the Debtor, produce cultured marble products but would, unlike the Debtor, have Cogan as its exclusive customer. Cogan apparently considered expeditious effectuation of this arrangement crucial to its interests because its regular supplier was having certain business problems which prevented it from providing an adequate supply of products to Cogan. Katzev agreed to this arrangement and Bunis formed a company with Katzev, known as Venetian Marble Company, Inc. ("Venetian"), to perform under its terms.

In order to permit Venetian to begin its operations, it was necessary that the Debtor transport the Equipment from the Debtor's location in Hatboro to a new location on North American Street, Philadelphia, Pennsylvania, proximate to Cogan's place of business. The crux of the instant Motion involves analysis of the terms under which the Equipment was provided to Venetian by the Debtor.

Katzev, although also a principal of a Dunkin' Donuts franchise, did not impress the court as a sophisticated businessman. Although we do not recall such a passage, it is possible, as the Bank argues, that he referred to the transfer of the Equipment as a "purchase" of it by Venetian from the Debtor. However, such a reference would have been in a colloquial sense, because there are numerous indicia that, in light of the relationship of the parties to the Venetian venture, the Equipment was not the subject of a "purchase" or "sale" by the Debtor to Venetian. Katzev testified that the only document drafted which reflected the relationship between the Debtor and Venetian was a Joint Venture Agreement ("the Agreement"), a copy of which was admitted into evidence, signed by Katzev, as President of the Debtor, and Bunis. Katzev further stated that, although Bunis did not suggest a revision of the terms of the Agreement, he "put off" signing it. The Agreement contained the following recitation regarding the Equipment:

[The Debtor] shall extend a loan to the joint venture in the form of its equipment and machinery which loan shall bear a face value equal to the book value which [the Debtor] has designated on its books. Said loan shall be paid off by applying 25% of the profits annually to pay down the loan. The present value of said equipment is One Hundred and Twenty Thousand Dollars ($120,000.00).

In April, 1990, Venetian, by Bunis as its President, made an application to the Bank for a loan in the amount of $25,000.00. Esposito testified that Venetian was introduced to the Bank by Haifetz, who had previously established a lending relationship with the Bank. The loan is evidenced by the following documents, dated April 24, 1990: (1) a promissory note signed only by Bunis as President of Venetian; (2) an Equipment Security Agreement ("the ESA"), signed by Bunis as President and Katzev as Secretary of Venetian. Although the description of the specific property secured by the ESA is blank, Bunis and a Bank officer initialled a clause indicating that the security included, "without limitation by any of the above, all machin-

ery, equipment, furniture and fixtures now owned and thereafter acquired by Debtor;" and (3) two UCC–1 Financing Statements, filed with the state and the county, respectively, signed only by Bunis, which describes the security interest taken as follows:

All of the following, now owned or hereafter acquired and all accessions thereto, products and proceeds (including insurance proceeds) thereof: all inventory, accounts, chattel paper, and instruments; all equipment, machinery, furniture and fixtures; all contracts, contract rights, general intangibles, parts, patents, processes, trade names and trademarks; all books, records, and computer media and all data contained thereon.

Esposito testified that, in connection with its application for the loan, Bunis provided the Bank with a three-page list of the specific equipment, machinery, and inventory that was to be used as collateral for the loan, which included the Equipment. Katzev admitted preparing this list and giving it to Bunis but stated that he was unaware that Bunis intended to and in fact did use it in connection with the loan. Katzev further testified that the list was not attached to any of the loan papers when he signed them and that he never intended to secure the loan with the Equipment. He and Bunis had signed personal guarantees in connection with the loan which he assumed were sufficient security for the Bank. Esposito, meanwhile, contended that obtaining a security interest in the Equipment was a significant factor in his decision to approve the loan to Venetian. However, although he had the list in his file, Esposito admittedly was uncertain whether it had ever been attached to the ESA.

Katzev further testified that, in September, 1990, Cogan's former supplier of marble products resumed business and, since Cogan apparently no longer needed Venetian, Bunis suddenly closed down its business, leaving Katzev without this enterprise or his old business. Payments to the Bank on the loan then also ceased.

On or about September 27, 1990, Katzev and Bunis met with several of the Bank's

loan officers, including Esposito, to discuss the loan. Katzev offered to pay half of the loan balance if Bunis would pay the other half. Bunis allegedly refused this offer. Katzev resisted the Bank's proposal that the Equipment be sold to satisfy the loan, claiming that he needed it in future business ventures.

Katzev then attempted to revive the Debtor's business at the Philadelphia location. Bunis instituted a lawsuit against Katzev, claiming that he was improperly using and wasting the assets of Venetian, including the Equipment, in this operation. This litigation was apparently settled when Katzev agreed to redraft the lease of the North American Street premises as an obligation of the Debtor rather than of Venetian. Katzev obviously believed that this litigation was a smokescreen designed to obfuscate the fact that Haifetz and Bunis had shamelessly "used" him and the Debtor when they were needed by Cogan and promptly discarded them when their services were no longer needed by Cogan.

## C. DISCUSSION

[A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(1) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned;

(2) value has been given; and

(3) the debtor has rights in the collateral.

13 Pa. C.S. § 9203(a). The Debtor disputes that the Bank's security interest in the Equipment is valid because (1) the ESA fails to adequately describe the collateral in which security was taken, as required by 13 Pa. C.S. § 9203(a)(1). *See also* 13 Pa. C.S. § 9110; and (2) Venetian, the debtor in the loan, did not have the ownership rights in the Equipment necessary to pledge it as

its collateral for the loan, because the Equipment belonged to the Debtor, in contravention of 13 Pa. C.S. § 9203(a)(3).

We conclude that the Debtor is entitled to prevail on the second ground, *i.e.,* that the Debtor rather than Venetian retained ownership of the Equipment at the time of the loan. There is little doubt that, if the Debtor, rather than Venetian, owned the Equipment at all relevant times, the Bank's purported security interest in it would be invalid. *See In re Sunshine Books, Ltd.,* 41 B.R. 712, 715 (Bankr.E.D.Pa.1984).

The Bank's principal contention is that the Debtor sold the Equipment to Venetian prior to the date of the loan, as evidenced by Venetian's possession of the Equipment at that time.

It is settled in Pennsylvania that possession of a chattel is deemed to be *prima facie* evidence of ownership. *Leitch v. Sanford Motor Truck Co.,* 279 Pa. 160, 123 A. 658 (1924). Thus, any person claiming ownership of property which is in the possession of another bears the burden of proving factors essential to his claim of ownership. *In re Carr's Estate,* 371 Pa. 520, 92 A.2d 213 (1952) (footnote omitted).

*Justice v. Fabey,* 541 F.Supp. 1019, 1023 (E.D.Pa.1982). However, it is also well-established that

[i]f evidence is introduced, the presumption has served its purpose and has no effect whatsoever. The fact finder could then find from the evidence the existence or nonexistence of the presumed fact. *Justice v. Fabey,* 541 F.Supp. 1019 (E.D.Pa.1982); Rule 301, Federal Rules of Evidence.

*Austin v. Borough of Ligonier,* 122 Pa. Cmwlth. 161, 162–63, 551 A.2d 403, 404 (1988). Thus, the *Austin* court likens the effect of the presumption of ownership arising from possession to that of any other presumption under Federal Rule of Evidence 301. Such a presumption is like a "bubble" which is "burst" by the introduction of evidence which tends to establish that the party in possession of the property in issue is not in fact its owner. *See In re Old World Cone Co.,* 119 B.R. 473, 477

(Bankr.E.D.Pa.1990). Once this presumption is burst, the burden of proof reverts to party obliged to establish ownership.

 Applying these principles to the instant contested matter, we conclude that Katzev's testimony "burst the bubble" of the presumption that Venetian owned the Equipment simply because it possessed the Equipment. The Bank produced no evidence to support its contention that Venetian did own the Equipment at the relevant time. Indeed, the conclusion that the Debtor sold or intended to sell the Equipment to Venetian was countered by all of the evidence presented at trial. It was not shown that Venetian had made a binding commitment to compensate the Debtor in any way for the Equipment. There is no basis for concluding that the Debtor meant to present Venetian with a gift of the Equipment, valued at $120,000. The very fact that the parties were negotiating the terms under which Venetian would be authorized to utilize the Equipment is inconsistent with the conclusion that any gift of same to Venetian was intended.

We recognize that, in certain circumstances, the actions of the "true" owner of property may estop the owner from denying a transfer of ownership of its property to another party. *See In re Pubs, Inc. of Champaign*, 618 F.2d 432, 436–39 (7th Cir. 1980). However, this sort of equitable estoppel against the "true" owner of property is not to be applied lightly. *See In re CS Associates*, 121 B.R. 942, 958, (Bankr.E.D.Pa.1990); and *In re Webb*, 99 B.R. 283, 290 (Bankr.E.D.Pa.1989).[1]

To establish an estoppel the one against whom it is sought to be invoked

must have had knowledge of the facts and must have intended that his conduct be acted upon. *Kirk v. Hartman*, 63 Pa. 97 [ (1869) ]. This has been extended to mean that the person acting must either know the true facts or be in a position to become aware of them, *Sundheim v. Beaver County Building and Loan Association*, 140 Pa.Super. 529, 14 A.2d 349 [ (1940) ], so that to deny what he previously asserted would render him guilty of fraud or of such gross negligence in ascertaining the truth in the matter as amounts to constructive fraud. *Bittner v. Quemahoning Coal Co.*, 271 Pa. 579, 116 A. 42 [ (1922) ]. If this element of fraud is wanting there can be no estoppel. *Hill v. Epley*, 31 Pa. 331 [ (1858) ]. It is noted that mere negligence is not sufficient to establish constructive fraud; it must be gross or culpable negligence. *Northwestern National Bank v. Commonwealth*, 345 Pa. 192, 27 A.2d 20 [ (1942) ].

*Hertz Corp. v. Hardy*, 197 Pa.Super. 466, 474, 178 A.2d 833, 837 (1962). *See also CS Associates, supra*, 121 B.R. at 958. Thus, where

one who has a temporary right to its use attempts to sell or pledge it without consent, the owner may follow and reclaim it no matter in whose possession it may be found: *King v. Richards*, 6 Wharton 418, 422 [ (1841) ]; *Easton v. Worthington*, 5 S. & R. [129,] 130 [ (1819) ].

*Leitch v. Sanford Motor Truck Co.*, 279 Pa. 160, 163, 123 A. 658, 659 (1924).

The culpable individual in the instant transaction appears to have been Bunis, not Katzev. Like the Bank, Katzev ap-

---

1. In these authorities, we defined the "elements" of equitable estoppel as follows, quoting 28 AM. JUR.2d 640–41 (1966):

"Broadly speaking, the essential elements of an equitable estoppel or estoppel in pais, as related to the party to be estopped, are (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; and (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3)

knowledge, actual or constructive, of the real facts. And, broadly speaking, as related to the party claiming the estoppel the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice (footnotes omitted)."

*CS Associates, supra*, 121 B.R. at 958; and *Webb, supra*, 99 B.R. at 290.

pears to have merely been a victim of Bunis's duplicity. Therefore, Bunis might be deemed to have intentionally misrepresented the fact of Venetian's ownership of the Equipment with knowledge that the Debtor actually owned it, for the purpose of deceiving the Bank. Bunis was apparently an agent authorized to act on behalf of Venetian. However, he was not an agent of the Debtor. Therefore, his actions can in no sense be deemed as intentional misrepresentations of ownership by the "true" owner of the Equipment, *i.e.*, the Debtor.

We expressly refuse to find that Katzev, who might have acted for the Debtor, played a significant role in Bunis's duplicity. Again, we find that he was merely another of Bunis's victims.

Furthermore, like the parties disputing ownership in *Hertz Corp., supra,* the Bank has neither pleaded nor presented evidence in support of estoppel. 197 Pa.Super. at 473, 178 A.2d at 836–37. In any event, it is not clear that the Bank could have established the requisite lack of any means on its part for ascertaining the true ownership of the Equipment. Therefore, it would have been unlikely to have convinced us that it reasonably relied on Bunis's representations. Venetian was a very new company having in its possession Equipment which obviously was not new and therefore must have been acquired elsewhere. *Compare Priester v. Milleman,* 161 Pa.Super. 507, 55 A.2d 540 (1947) (alleged bailee's 15–year delay in asserting rights to piano may not have estopped it from claiming ownership of the piano).

These facts should have suggested to the Bank that extreme caution in investigation of Venetian's ownership of these asset would have been prudent. However, Esposito admitted that the Bank made no inquiry from Bunis regarding Venetian's purported acquisition of the Equipment.

It is apparent to us that the closeness of the Bank to Haifetz was a driving force in the making of the loan, and investigation regarding the validity of its security interest was neglected by the Bank. Although Katzev may have been negligent in placing Bunis in a position where he could attempt to compromise the Debtor's ownership of the Equipment, the Bank was negligent to at least an equal degree by closing its eyes to the realized potential that Venetian did not own the Equipment.

The circumstances of the instant matter are clearly distinct from those in *Pubs of Champaign, supra.* In that case, both of the debtor's principles intended to provide a security interest in collateral to the bank, but the papers were executed in a fashion which frustrated this intention. 618 F.2d at 435. By way of contrast, neither Katzev nor the Debtor ever intended to extend a security interest in the Debtor's property to the Bank.

Therefore, we conclude that the Debtor was and remains the owner of the Equipment and that the Debtor is not estopped from asserting its right of ownership of the Equipment against the Bank.

The Bank raises several counterarguments which range from being of doubtful relevance to being full-fledged straw men. First, it argues that, under Article 2 of the Uniform Commercial Code and, particularly, 13 Pa.C.A. § 2401 thereof, title and therefore ownership of the goods allegedly sold from the Debtor to Venetian, *i.e.,* the Equipment, passed upon their delivery to Venetian. The difficulty with this argument is that we have already concluded that a sale of the Equipment by the Debtor not only was not consummated as of the date of the loan from the Bank to Venetian in issue, but also was never intended to, and in fact never did, occur. The issue is therefore not *when* ownership passed from the Debtor to Venetian, but *if* it *ever* would pass. We have already concluded that the Debtor and Venetian never made any agreement that ownership would *ever* pass, and therefore we conclude that ownership never was to pass to Venetian. For this reason, the first argument of the Bank must fail.

Secondly, the Bank argues that the Debtor has not satisfied the criteria of 13 Pa. C.S. § 2702 necessary to assert reclamation rights to the Equipment. This may be true. However, the Debtor never based its claim of ownership of the Equipment upon

any rights to reclaim the Equipment. Rather, it argued—successfully, we conclude—that rights of ownership of the Equipment never passed to Venetian. Hence, no ownership rights to the Equipment ever vested in Venetian which the Debtor was obliged to reclaim.

Finally, the Bank argues that any purported lease or joint venture agreement between the Debtor and Venetian was, in substance and at law, a conditional sale of the Equipment from the Debtor to Venetian. However, our conclusion that no sale of the Equipment to Venetian transpired was not coupled with any conclusion that the transaction between the Debtor and Venetian was a "true lease" or a consummated joint venture agreement. Rather, the Debtor argued, and we concluded, that there was simply no transfer of ownership of the Equipment to Venetian, and that is the only issue that we believe is relevant.

We do believe that the fact that the Joint Venture Agreement was drafted reflects an intention of the parties to enter into a joint venture. However, we fail to see how an agreement of the Debtor and Venetian to be joint venturers supports the suggestion that the Debtor meant to sell (or give without consideration) its most valuable assets, *i.e.*, the Equipment, to Venetian. *Cf. In re PCH Associates*, 122 B.R. 7 (S.D.N.Y. 1990) (relationship of parties found to be a joint venture and *not* a sale of property).

One other issue deserves some attention. The Debtor argues that, even if there were a sale of the Equipment to Venetian, the Bank did not have a valid security interest as to the Equipment because of its purported failure to have Venetian execute a security agreement which adequately described the collateral in issue, and therefore failed to meet the requirement of 13 Pa.C.S. § 9203(a)(1), as well as that of § 9203(a)(3). This argument is based upon the observation that the place on the ESA form for the description of the property secured has been left blank, and that the list of the Equipment was not attached to the ESA and therefore was not part of the description of the secured property in the ESA. However, this argument overlooks the fact that the clause of the ESA initialled by the parties on the ESA form, and therefore relevant to the instant transaction, regarding the description of the security taken by the Bank is the clause stating that a security interest has been taken in "all" of Venetian's "machinery, equipment, furniture and fixtures."

■ There is substantial authority for the principle that a clause in a security agreement which recites an intention of the secured party to take a security interest in "all" of a debtor's assets of a certain kind is a sufficiently specific description of the secured property required by §§ 9203(a)(1) and 9110. *See In re Platt*, 257 F.Supp. 478, 481 (E.D.Pa.1966); *In re McClure*, 108 B.R. 468, 469–70 (Bankr.M.D.Pa.1989); *In re Young*, 42 B.R. 939, 940 (Bankr.E.D.Pa. 1984); and Annot., *Sufficiency of Description of Collateral in Security Agreement Under UCC §§ 9–110 and 9–203*, 100 A.L. R.3d 940, 1010–13 (1980).

The difficulty which arises for the Bank in the instant transaction is that this description obviously embraces only "all" property as described which was owned by Venetian. By failing to reference the Equipment, the ESA in no way assists the Bank in establishing that the Equipment was Venetian's property. The omission of a reference to the Equipment in the ESA also had the effect of putting Katzev off his guard that the Equipment was included as secured property. Katzev obviously read the ESA, as do we, as not including the Equipment, because the Equipment was not included within the category of "all" of *Venetian's* property.

■ It is also established, in this Circuit, that a description of property secured in a financing statement may itself take the place of a description of this property in a security agreement as long as the financing statement adequately describes the property which is the subject of the financing agreement. *In re Bollinger Corp.*, 614 F.2d 924 (3d Cir.1980). Here, although the language of the ESA is quite generalized, the language of the financing statements filed by the Bank is quite detailed. *See*

**470**

page 5 *supra.* *But cf. In re H.L. Bennett Co.,* 588 F.2d 389 (3d Cir.1978) (financing statement which seeks to incorporate a security interest in "[a]ll assets contained in the security agreement" lacks requisite specificity and is invalid). This point does not, of course, help the Bank, because "all" of the assets of Venetian could not include the Equipment which was an asset of the Debtor and not an asset of Venetian.

Therefore, it appears that the ESA satisfies the requirement of § 9203(a)(1). However, the ESA does not and, indeed, as § 9203(a)(3) underscores, could not, provide the Bank with a security interest against the Equipment, which Venetian did not and never has owned.

### D. CONCLUSION

Consequently, we are obliged to grant the instant Motion only insofar as it requests us to determine the ownership of the Equipment. However, as we conclude that the Debtor, and not Venetian, has been the owner of the Equipment at all relevant times, we must declare that the Debtor is the owner of the Equipment and deny that aspect of the Motion in which the Bank seeks to obtain relief from the automatic stay to enforce its non-existent secured rights against the Equipment.