**In re Harry Jay KATZ, Debtor.**

**Christine SHUBERT, Trustee, Plaintiff,**

**v.**

**Selma KATZ and Corestates Bank, N.A. as co-executors of the will of Lawrence Katz, deceased, Defendants.**

**Bankruptcy No. 95–18653DAS.
Adversary No. 97–1111DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

April 30, 1998.

See also 203 B.R. 227.

Joshua M. Briskin, Philadelphia, PA, for Debtor.

Christine C. Shubert, Tabernacle, NJ, trustee.

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, General Counsel for trustee.

Edmund K. John, Media, PA, Special Counsel for trustee.

Philip A. Kircher, Schnader, Harrison Segal & Lewis, Philadelphia, PA, for Defendants.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant adversary proceeding ("the Proceeding") was filed by CHRISTINE SHUBERT, TRUSTEE ("the Trustee"), appointed in the individual voluntary Chapter 7 bankruptcy case of HARRY JAY KATZ ("the Debtor"), to attempt to recover, for the estate, certain significant property and property interests which the Debtor failed to disclose on his bankruptcy Schedules and Statement of Financial Affairs (collectively "the Schedules"). The genesis of the Proceeding was our prior Opinion, reported at 203 B.R. 227 (Bankr.E.D.Pa.1996), aff'd, C.A. No. 97–550 (E.D.Pa. Sept. 10, 1997) ("Katz I"), in which, in the suit of Susan Croge, a former fianceé and creditor of the Debtor, we denied the Debtor's discharge because he failed to disclose the opulent circumstances in which he lived and because he failed to list certain creditors. Although the Debtor's gross violations of 11 U.S.C. § 727(a)(4) were amplified by the record made in the Proceeding,[1] and the Debtor's utter disregard of his duty of disclosure plus his high standard of living clearly warranted the careful scrutiny undertaken by the Trustee and her special counsel, we find that, except for items of personalty in the Debtors residence, which may be the most difficult of the property at issue to actually liquidate, the Trustee comes up dry.

Specifically, we conclude that, being forced to alter our previous non-determinative ruling in Katz I, 203 B.R. at 233–34, the testamentary trust created for the Debtor's benefit by his father, Lawrence Katz ("the Father"), is in fact a spendthrift trust, the corpus and income from which is excluded from the Debtor's estate pursuant to 11 U.S.C. § 541(c)(2). We also agree with the assertion of SELMA KATZ ("the Mother") and CORESTATES BANK, N.A. ("the Bank;" with the Mother, "the Defendants"), the administrator and trustees of the Father's trusts, that no residual trust

---

1. For example, it was established that the Debtor deposited and withdrew approximately $200,000 annually from bank accounts in the names of dormant entities which had previously filed liqui- dated Chapter 11 cases which he utilized as his personal accounts in the period from 1994 through 1997, none of which was disclosed or in any way referenced on his Schedules.

as described in the Father's will came into existence, thus precluding the Trustee's obtaining any proceeds from any of the trusts at issue. The Trustee also failed to establish any rights to real estate titled or formerly titled to the Father's estate ("the Estate"). The presence of a valuable ring given to and taken back from Croge was not proven. Only certain personalty in the Debtor's residence, the title to which real estate is in the Estate, which was not specifically identified as hers by the Mother is actually determined herein to be the property of the Debtor available for distribution by the Trustee.

In light of the foregoing conclusions, we will re-schedule on May 14, 1998, the hearing on the Trustee's motion to sell the Debtor's personalty ("the Sale Motion"), filed on December 5, 1997, but carried along until the disposition of this Proceeding; and the status hearing, intended principally to set deadlines for completion of the administration of this now long-pending case, which was also carried along until the disposition of this Proceeding.

### B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed the underlying Chapter 7 bankruptcy case on November 3, 1995. After we denied the Debtor's discharge in *Katz I,* the Trustee, after performing some preliminary investigation and reconsidering her earlier report that this was a no-asset case, requested that Edmund K. John, Esquire ("John"), be appointed as her Special Counsel, which application we granted on April 4, 1997. After a lengthy period of discovery, John commenced the Proceeding on November 6, 1997, against the Defendants.

The Complaint filed in the Proceeding sought the turnover of ten items of subject property from the Defendants, in their capacity as co-executors of the Estate:

(1) the Debtor's twelve and one half (12 1/2%) percent interest in approximately 619 acres in Solebury Township, Bucks County, Pennsylvania, valued in March 1990 at approximately $15,000,000;

(2) the Debtor's $100,000 cash gift, plus interest, that was placed in a discretionary trust, under the provisions of paragraph (c.) of Article FOURTH of the Last Will and Testament ("the Will") and Codicil thereto ("Codicil") of the Father;

(3) the Debtor's twelve and one-half (12 1/2%) percent interest in the real and personal property located at 6551 Meetinghouse Road, which is part of the Solebury Estate;

(4) the Debtor's twelve and one-half (12 1/2%) percent interest in imputed rent, plus interest, which allegedly should have been collected, from his brother, Philip Katz, who resides on the Solebury Estate, by Solebury Enterprises or its predecessors from May 19, 1983, to the present;

(5) all of the Debtor's property which has been removed from 3343 Schoolhouse Lane, Philadelphia, Pennsylvania ("Schoolhouse Lane"), between May 19, 1983 and the present;

(6) the Debtor's alleged real property located at Schoolhouse Lane;

(7) the Debtor's one-third (1/3) interest in all property which allegedly should have been included in the residuary estate that was created by the provisions of the Will and Codicil of the Father, plus interest;

(8) the Debtor's interest in the gross proceeds from the sale of real estate at 1026 Pine Street, Philadelphia, Pennsylvania ("Pine St.") by the Estate;

(9) the Debtor's twelve and one-half (12 1/2%) percent of the gross proceeds from the sale of land by the Solebury Estate Partnership between July 20, 1994, and March 3, 1997; and,

(10) a round sapphire and diamond ring, which, based upon testimony given by Croge, the Debtor gave to her as an engagement ring and forcibly removed from her hand when the engagement was terminated.

The Defendants moved to dismiss the Complaint, or for a more definite statement ("the Motion") on December 31, 1997. By order dated January 8, 1998, we denied the aspect of the Motion requesting a more definite statement, required the Defendants to answer the Complaint, and allowed discovery to proceed. By order dated February 26,

1998, we denied the remaining aspect of the Motion in a decision reported at 1998 WL 85265 ("*Katz II* ").[2] A trial approximately 15 hours in length was conducted on March 18, March 19, and March 20, 1998.

At trial it was established that the Father died on May 19, 1983. The Will was executed on August 20, 1979, and the Codicil to the Will was effected on September 19, 1982. Named as co-executors of the Will were the Defendants. The Will referenced three separate trusts relevant to the Proceeding, specifically: (1) a trust for the benefit of the Debtor ("the Debtor's Trust"); (2) a marital deduction trust ("the Marital Trust"); and (3) a residuary trust ("the Residuary Trust").

The Defendants were named as co-trustees of the Debtor's Trust. The Mother is the sole beneficiary of the Marital Trust, as provided for in the Codicil, which terminates upon her death. The Will also provided that, should the Residuary Trust come into existence, the Mother was to be the sole beneficiary of that Trust during her lifetime, and that she was empowered to bequeath any and all remaining principal therein at the time of her death in any way she saw fit, subject to protection from creditors.

The Father was a very successful businessman who had been a generous husband and father, making substantial gifts and loans to his family during his lifetime. After his death, the Mother continued her husband's gift-giving tradition for her children, including the Debtor, and her grandchildren, specifically providing each heir with a $10,000 cash gift at Hanukkah. There is no doubt that the Father provided significant financial support to the Debtor as he became involved in numerous apparently unsuccessful business ventures, and that since 1983 the Mother has continued to similarly provide significant financial support to the Debtor.

Before his death, the Father owned a one-half interest in 619 acres of largely undeveloped property in Solebury Township, near New Hope, Bucks County, Pennsylvania, which he shared with a partner, Hess Kline. After the Father's death, his one-half interest passed to the Estate. In order to buy out Kline's interest in the Solebury property, the Mother formed a Pennsylvania limited partnership, with herself as general partner, known as Solebury Enterprises. The limited partners therein were her other two children, Terry Shestack and Philip Katz, and the Debtor's Trust in lieu of the Debtor. The Defendants, in their capacity as co-trustees, invested $90,000 of $100,000 with which the Debtor's Trust originally had been funded in Solebury Enterprises. Each of the other limited partners also invested $90,000. Solebury Enterprises funded the remainder of the buy-out of Kline's interest in the Solebury property with a $1 million loan personally guaranteed by the Mother, for which she provided her own stock portfolio as collateral. Together, the fifty (50%) percent interest of Solebury Enterprises and the Estate's fifty (50%) percent interest in the Solebury property make up Solebury Farms Joint Venture ("Solebury FJV"). The limited partnership interest owned by the Debtor's Trust in Solebury Enterprises, and by extension in Solebury FJV, is the asset of the most significant value at issue in the Proceeding.

Also at issue is the home in which the Debtor resides, Schoolhouse Lane. The Father purchased this property in 1967, and initially authorized the Philadelphia College of Textiles and Sciences basketball coach to reside there free of charge. In 1981, the Father and the Mother allowed the Debtor and his then-wife to live at Schoolhouse Lane while awaiting the birth of their first child. The Debtor has lived in that premises continuously since that time. The deed to this property was in the Father's name alone at his death, and, after his death in 1983, the title to the property passed to the Estate, in which it remains to this date. Since 1983, the Bank, as co-executor of the Estate, has arranged for payment, with Estate assets, of

---

**2.** The fact that we denied each and every aspect of the Dismissed Motion was not in any sense to be interpreted as an indication that the Trustee's claims had merit. *See, e.g., In re Nutri/System, Inc.,* 169 B.R. 854, 858 (Bankr.E.D.Pa.1994), *aff'd sub. nom. In re Nutri/System of Florida Associates,* 178 B.R. 645 (E.D.Pa.1995) (plaintiffs denied relief in all actions despite their ability to withstand a dismissed motion). Rather, *Katz II* constituted only a determination that the Complaint stated a cause of action as to all claims made.

real estate taxes on the property, insurance on the home, and general maintenance and improvements to the exterior of the house and the land on which it sits.

Very little evidence was presented regarding the contents of Schoolhouse Lane, also at issue in the Proceeding. In *Katz I*, 203 B.R. at 230, we noted that Croge described Schoolhouse Lane as "a lavishly-decorated ten-room mansion, which includes, *inter alia*, a safe, a full room containing the Debtor's expensive wardrobe, an additional walk-in closet containing only his suits, . . ." The Debtor claimed, in his testimony in the Proceeding, that all or most of the personalty therein belonged to the Mother or his brother Philip. The Mother, who had, on at least two occasions, filed third-party property claims in order to contest execution of this personalty to collect on judgments against the Debtor, stated that she owned sculptures, artifacts, and art in the entrance hall and on the stairs; a table, sofa, and rugs in the living room; the dining room table and chairs; and an armoire and rugs in a bedroom, presumably the master bedroom.[3] Other property, which she estimated as half of all of the contents of Schoolhouse Lane, was described as belonging to the Debtor's unidentified children, none of whom apparently reside at Schoolhouse Lane.

Pine St. was identified as a home once owned by the Debtor which was purchased at a sheriff's sale by the Father on September 8, 1975, after the Debtor had defaulted on the mortgage. The Debtor continued to live in Pine St. for a period of time after this sale and purchase. Since Pine St. was owned by the Father alone at the time of his death, it, like Schoolhouse Lane, passed into the Estate. For some years, the Estate paid for insurance, real estate taxes, and other expenses for this property. On May 14, 1986, the Estate sold Pine St. to unidentified third parties for $90,000.

Finally, the Trustee sought turnover of a sapphire and diamond ring owned and allegedly worn at trial by the Mother. The Mother testified that the ring she wore on the day of her testimony had been the Father's ring, referenced in the Will, which had been given by her to him on their twenty-fifth wedding anniversary. The Debtor, in his testimony at the instant trial, claimed that the ring that he gave to Croge, to which the Trustee lay claim, was in fact a "Linde" sapphire, or imitation sapphire, similar in design and appearance to the Mother's ring, and was now in the possession of his daughter Susan. Croge, who also briefly testified, admitted that she had no basis for distinguishing the imitation ring from the "real" one, and never had her ring appraised to determine whether it was in fact valuable. The Trustee also presented a photograph of Croge wearing a ring, but we were not able to tell whether the ring purportedly on her finger in the picture was the same ring worn by the Mother in the courtroom.

Pursuant to our post-trial order, the Trustee and the Defendant timely submitted briefs on April 3, 1998, and April 17, 1998, respectively.

## C. DISCUSSION

### 1. The Debtor's Trust Is a "Spendthrift Trust" Which Is Not Property of the Debtor's Estate.

At the outset we reject, with no further discussion, any claims that the Trustee has an interest in the Schoolhouse Lane or Pine St. realty or the valuable sapphire and diamond ring worn by the Mother at trial. It was convincingly proven that the Estate owns Schoolhouse Lane and, contrary to the

---

**3.** The Trustee argues that adverse decisions on these third-party property claims in earlier state-court actions should bar the Mother from claiming ownership of this property in the Proceeding. However, as the Defendants point out, one of these claims, expressly including only the dining room table and chairs among the property identified by the Mother at trial, was successful. The later claims, which specifically named only the dining room table and chairs and the living room sofa and table among the property identified by the Mother at trial, was ultimately denied because the Mother was allegedly aged and unable to appear for the hearing and her request for a continuance was denied. These decisions are inconsistent and neither appears to have been entered on the basis of any specific findings on the merits. We will therefore not accord any *res judicata* or collateral estoppel effect to these decisions. *See In re Bova*, 211 B.R. 803, 810 (Bankr.E.D.Pa.1997).

Trustee's weak rejoinders asserting some sort of oral life estate of the Debtor, such an "interest" does not provide him, or the Trustee standing in his shoes, with any interest in this property capable of sale. The claim to Pine St., long since sold by the Estate, is even weaker, and must also be rejected.

There is no evidence that the Debtor has or had any interest in the only ring in which the Trustee has expressed an interest, *i.e.*, the genuine sapphire and diamond ring which is referenced in the Will but which the Mother credibly testified that she has worn for many years. Apparently, Croge received a far less valuable ring, now in possession of the Debtor's daughter, which the Trustee has expressed no interest in selling.

The items of most consequence to the Trustee were clearly the Debtor's interests in the testamentary trusts created by the Father, which own a substantial interest in the valuable Solebury real estate. In this connection, the only clearly viable property of which the Trustee seeks turnover from the Defendants constitutes the corpus of the Debtor's Trust, established under the Will. The primary asset of the Debtor's Trust is, specifically, a twenty-five (25%) percent interest in Solebury Enterprises, which converts to a twelve and one-half (12 1/2%) percent interest in the Solebury FJV. Relying on our comments in *Katz I*, 203 B.R. at 233–34, that this Trust is discretionary rather than spendthrift, the Trustee argues that the Defendants are precluded by *res judicata* or collateral estoppel from asserting that the Debtor's Trust is a spendthrift trust, and thereby excluded from his bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2).

Since the Trustee's principal argument relates to *res judicata* and collateral estoppel, we first turn to the issue of the conclusivity of our statements regarding the nature of the Debtor's Trust in *Katz I*. We note that all that we were deciding in *Katz I* was whether the Debtor's discharge should be denied on the basis of 11 U.S.C. § 727(a)(4)(A), requiring that the Debtor be denied a discharge if he were found to have knowingly and fraudulently made a false oath or account. *Id.* at 231–32. We found that the Debtor has made "pervasive omissions and misleading statements in his Schedules," and failed to include many interests in property that we concluded that the Debtor in fact had. *Id.* at 232. The unlisted property included interests in businesses, bank accounts,[4] and personal property. *Id.* at 233–35. It also included the Debtor's Trust. *Id.* at 233–34. As to the latter, we stated that "[a]t least the existence of the trust of which the Debtor is a beneficiary should have been disclosed." *Id.* at 233. While we analyzed the Trust and concluded in *Katz I* that it was not a spendthrift trust, our only holding relevant to the outcome of *Katz I* as to the Trust was that, regardless of its characterization as either spendthrift or discretionary, the Debtor should have included a reference to the Trust on his Schedules. "The presence of even a spendthrift trust should be disclosed, although it is not property of the debtor's estate." *Id.* at 234. *Accord, In re Blanchard,* 201 B.R. 108, 122–27 (Bankr.E.D.Pa.1996). That conclusion, together with the other unlisted property that the Debtor failed to include on his Schedules, led to our holding that the Debtor had knowingly made false and material statements in his Schedules which warranted denial of his discharge. *Id.* at 236.

■ In order for the Defendants to be barred or collaterally estopped from litigating the issue of whether the trust for the benefit of the Debtor is properly characterized as spendthrift trust in the context of this Proceeding, four factors must be satisfied:

(1) the issue sought to be precluded must be the same as that involved in the prior action; (2) that issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment.

*In re Ross,* 602 F.2d 604, 608 (3rd Cir.1979). *Accord, e.g., Raytech Corp. v. White,* 54 F.3d 187, 190 (3rd Cir.1995); and *In re Laubach,* 77 B.R. 483, 485–86 (Bankr.E.D.Pa.1987).

■ We find that these factors are not satisfied here. First, the issues in the prior litigation and the issues in this litigation are

---

4. *See* page 558 n. 1 *supra.*

not the same. The issue in *Katz I* was the adequacy and accuracy of the Debtor's Schedules, to which the nature of the Debtor's Trust was at best incidental, while the issue in the instant Proceeding is the Trustee's entitlement to turnover of the Debtor's Trust. Second, the nature of the Debtor's Trust was not actually litigated in *Katz I*. The nature of the trust was not at issue and was argued and briefed summarily in this Court. It is not referenced at all in the brief district court decision on appeal. Third, our initial characterization of the Trust as discretionary rather than spendthrift was not essential to the prior holding. We stated in *Katz I* that, even if the Trust were a spendthrift trust, it still should have been disclosed in the Debtor's Schedules. Our finding that the Debtor failed to disclose the Trust was necessary to our holding denying the Debtor's discharge; our characterization of the Trust was not.

In addition, in *Katz I*, we reached our initial conclusion that the Trust was not spendthrift without the benefit of briefing or argument by the Defendants, who were not parties to the *Katz I* proceeding and who had no reason to intervene to assure that the nature of the trust was being accurately determined, since it was not the issue being litigated in the discharge determination. While it is true that the Debtor attempted to argue that the Trust was spendthrift in *Katz I*, the quality of the representation by the parties and their counsel in that proceeding was in no sense comparable to that included in the record and briefs of the instant Proceeding.

▆▆▆ Although not argued directly by the Trustee, we have also considered whether the "law of the case doctrine," *i.e.,* the principal that courts will not reopen what has already been decided by them, applies to our statements relevant to this issue in *Katz I*. *See, e.g., Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *Messenger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912); *Cowgill v. Raymark Industries, Inc.,* 832 F.2d 798, 802–04 (3d Cir.1987); *Zichy v. Philadelphia,* 590 F.2d 503, 508 (3d Cir. 1979); and *In re Cole,* 89 B.R. 433, 436

(Bankr.E.D.Pa.1988). As we recognized in *Cole, supra,* at *id.,* "this doctrine should not constitute a mandate to adhere to a previous erroneous decision," and should not be followed when we deem a prior ruling to have been "clearly erroneous" and capable of working "a manifest injustice" to apply it. In light of the convincing and more complete evidence presented in the record of this Proceeding on this issue, we conclude that it would work a manifest injustice to apply the "law of the case doctrine" to refuse to revisit what we now believe was an erroneous decision that the Debtor's Trust was not a spendthrift trust.

Part of our reason for revisiting our *Katz I* decision on this point was based on the convincing expert testimony of the Defendants' expert witness, John Terrill, Esquire. At trial the Trustee objected to Terrill's testimony as improperly addressing an ultimate issue before us. Having apparently satisfied herself that Federal Rule of Evidence ("F.R.E.") 704(a) eliminates that basis for objection, the Trustee now reverses her field and argues that F.R.E. 702 is applicable and bars testimony of "ultimate legal issues," citing principally *Molecular Technology Corp. v. Valentine,* 925 F.2d 910, 918–19 (6th Cir. 1991); *Specht v. Jensen,* 853 F.2d 805, 807–10 (10th Cir.1988) (en banc); *United States v. Zipkin,* 729 F.2d 384, 386–89 (6th Cir.1984); and *Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505, 509–10 (2nd Cir.1977).

All of these decisions appear to be based on the theory that an expert should not be permitted to circumvent a jury's function by allowing a judge to delegate his function to an expert. This trial was of course non-jury and we recognized that Terrill was merely an expert for an advocate and not a seer whose conclusions we were powerless to challenge. Moreover, Terrill is not a judge, *compare Zipkin,* and he did not purport to provide evidence touching on any issue except his narrow area of expertise, the nature of spendthrift trusts. *Compare Molecular Technology* (testimony was presented by the expert relevant to the requirements of an entire body of securities law); *Specht* (testimony touched on nearly every element of the plaintiffs' unlawful search case); and *Marx*

(comments went beyond area of expertise in securities law to contract interpretation issues before the court).

It seems to us that F.R.E. 702, like F.R.E. 704, is inclusive, not exclusive. Terrill's testimony was concise and limited to his area of expertise. There is no legal basis on which to exclude Terrill's helpful analysis of the important, if not ultimate, issue of whether the Debtor's Trust is a "spendthrift trust." We therefore conclude that the Defendants are not collaterally estopped from litigating the nature of the Debtor's Trust, and that the evidence which they presented, including the testimony of several Bank trust officers and Terrill which was absent from the first trial, provided us with a much fuller record than the *Katz I* trial as the basis for our decision on this issue.[5]

 Having satisfied ourselves that the Defendants are not barred by *res judicata* or collateral estoppel from litigating the nature of the Debtor's Trust, and that all of the evidence presented on this issue was admissible, we now turn to the issue of whether the Debtor's Trust is or is not a spendthrift trust. We find that, under Pennsylvania trusts and estates law, the Will creating the Debtor's Trust contains protective provisions which render that Trust a spendthrift trust, the corpus of which is exempt from liquidation by the Trustee in the course of her administration of the Debtor's bankruptcy estate under § 541(c)(2).

Pennsylvania has long permitted testators to create "spendthrift" trusts. *See, e.g., Blanchard, supra,* 201 B.R. at 124–25; *In re Babo,* 81 B.R. 389, 391 (Bankr.W.D.Pa.1988), *reconsideration denied,* 97 B.R. 827 (Bankr. W.D.Pa.1989); *Posner v. Sheridan,* 451 Pa. 51, 59–60, 299 A.2d 309, 313 (1973) (by implication); *Clark v. Clark,* 411 Pa. 251, 191 A.2d 417 (1963); *Riverside Trust Co. v. Twitchell,* 342 Pa. 558, 20 A.2d 768 (1941); *In re Morgan's Estate,* 223 Pa. 228, 230, 72 A. 498, 499 (1909); and *Fisher v. Taylor,* 2 Rawle 33

(Pa.1829). Under the RESTATEMENT (SECOND) OF TRUSTS § 152 (1967) ("the Restatement"), referenced in several cases interpreting Pennsylvania trusts law, *e.g., Schreiber v. Kellogg,* 50 F.3d 264, 275 (3d Cir.1995); and *Widener & Bigelow Trusts,* 16 Fiduciary Rptr.2d 159, 161 (Montgomery Co., C.P.), *aff'd sub nom. Estate of Widener,* 697 A.2d 281 (Pa.Super.1996), *appeal denied,* 548 Pa. 670, 698 A.2d 594 (1997), *cert. denied, sub nom. AmerSig Graphics, Inc. v. Estate of Widener,* —— U.S. ——, 118 S.Ct. 696, 139 L.Ed.2d 640 (1998), a spendthrift trust is one in which the beneficiary is entitled to the income from the trust property for life and "his interest shall not be transferable by him and shall not be subject to the claims of his creditors." Such a "valid restraint on the voluntary and involuntary transfer of the interest of the beneficiary" constitutes a spendthrift trust. *Id. See also In re Comp,* 134 B.R. 544, 550–51 (Bankr.M.D.Pa.1991); *In re Atallah,* 95 B.R. 910, 919 (Bankr.E.D.Pa. 1989); and *In re Hysick,* 90 B.R. 770, 774 (Bankr.E.D.Pa.1988). "No particular language is necessary to create a spendthrift trust." *Widener, supra,* 16 Fiduciary Rptr. at 161. "[T]he effect of a valid spendthrift provision is that the income can be attached, if at all, only in the hands of the beneficiary." *Id.* at 162. This concept extends to the principal of the trust as well, if the trust instrument so provides, pursuant to § 153(1) of the Restatement ("if by the terms of a trust the beneficiary is entitled to have the principal conveyed to him at a future time, a restraint on the voluntary transfer of his interest in the principal is valid").

The Will contains a protective provision applicable to all trusts created therein, including the Debtor's Trust. It provides that "[n]o interest in income or principal shall be assignable by, or available to anyone having a claim against, a beneficiary before actual payment to the beneficiary." We find that this provision contains the elements of a spendthrift trust as is generally recognized

---

5. Our statements in *Katz II,* 1998 WL 85265, at *5, on this subject must be read in the context of our consideration of the Federal Rule of Civil Procedure ("F.R.Civ.P") 12(b)(6) motion at issue there. We stated merely that the *Katz I* decision

on this point "gives pertinent support" to the Trustee's position and that the Defendants "seem to be in privity with the Debtor" as to this issue. This language clearly did not affect a decision on the merits on this issue. *See* page 558 n. 2 *supra.*

by trusts and estates practitioners in Pennsylvania, per the applicable case law and the testimony of Terrill. It is similar to the spendthrift language at issue in *Clark, supra,* which provided that "[n]either the principal nor the income bequeathed under this Will shall be assigned or anticipated by the beneficiaries named therein, nor shall the same be subject to attachment or execution in the hands of the Executors or Trustee." 411 Pa. at 252, 191 A.2d at 418.

The protective provision associated with the Debtor's Trust has two elements or clauses. First, it provides that "[n]o interest in income or principal shall be . . . available to anyone having a claim against, a beneficiary before actual payment to the beneficiary." Thus, creditors of the Trust's beneficiary may not attach either principal or income of the Trust before the co-trustees have actually distributed them. Second, it states that "[n]o interest in income or principal shall be assignable by . . . a beneficiary before actual payment to the beneficiary." Thus, the Debtor as the beneficiary may not assign his interest in either the principal or income of the Trust before the co-trustees have actually distributed them to the Debtor. We find that these protective provisions prohibit both voluntary assignment of the trust principal and income by the Debtor, and involuntary attachment of the trust principal and income by creditors, the two essential elements of a spendthrift trust in Pennsylvania.

 The Trustee's argument that the trust is not spendthrift focuses on (1) the Debtor's oral statements to Chestnut Hill Bank in making a loan and other persons such as Croge over the years that he has an outright interest in the Solebury property, rather than an interest in it held in trust; (2) the Debtor's taking a role in marketing certain trust property; and (3) approval signature lines for the Debtor appear on certain agreements executed in connection with this property, presumably also indicating his need to personally approve same. We find that neither of these alleged indicia of the Debtor's unrestricted ownership have any bearing on the characterization of the Trust. Only the language of the Trust, evidencing as it does the testator's intent, can bestow upon or

deny a trust spendthrift status. "No principal in the law of wills and trusts is more firmly established than that the intention of the testator or settler must prevail." *Clark, supra,* 411 Pa. at 255, 191 A.2d at 419–20. Given the above, we conclude that the Debtor's Trust is a spendthrift trust. *Accord, e.g., Blanchard, supra,* 201 B.R. at 124–25.

The Trustee also attempts to argue that, even if the Trust is spendthrift in nature, the Debtor's creditors may nevertheless reach the Trust's assets under the principles enunciated in *Schreiber, supra,* 50 F.3d at 271–76. She also argues that certain statements in *Katz II,* at *12, support this result. Again, however, such statements must be considered in the limited context of a F.R.Civ.P. 12(b)(6) motion.

 Moreover, as we noted in *Katz I, supra,* 203 B.R. at 234, it is well established that spendthrift trusts are excluded entirely from bankruptcy estates under § 541(c)(2). *See Patterson v. Shumate,* 504 U.S. 753, 757–60, 112 S.Ct. 2242, 2246–48, 119 L.Ed.2d 519 (1992); *Blanchard, supra,* 201 B.R. at 124–26; *Comp, supra,* 134 B.R. at 549; *Atallah, supra,* 95 B.R. at 914; *Hysick, supra,* 90 B.R. at 772; and *Babo, supra,* 81 B.R. at 391. Courts have thus uniformly rejected attempts by bankruptcy trustees to bring spendthrift trusts into a bankruptcy estate as contravening § 541(c)(2). *See, e.g., In re Evans,* 88 B.R. 813 (Bankr.M.D.Tenn.1988); *In re Cypert,* 68 B.R. 449 (Bankr.N.D.Tex.1987); and *In re Hecht,* 54 B.R. 379 (Bankr. S.D.N.Y.1985), *aff'd, sub. nom. Togut v. Hecht,* 69 B.R. 290 (S.D.N.Y.1987).

In *Cypert, supra,* the trustee, like the instant Trustee, argued that, because state law permitted invasion of spendthrift trusts by certain limited categories of individuals, the trustee should be permitted to invade the spendthrift trust. *Id.* at 451. The court rejected the trustee's argument, reasoning that these state-law exceptions "are particular to certain hypothetical creditors and would not be considered property of the [bankruptcy] estate in any case." *Id.* Relying in part on *Cypert, supra,* the court in *Evans, supra,* also held that a bankruptcy trustee could not invade a spendthrift trust that was excluded from the bankruptcy es-

tate under § 541(c)(2). Again, although state law created some limited exceptions under which certain creditors could pierce spendthrift trusts, the court held that the bankruptcy trustee was not empowered to do so, stating that "[t]he scant case law has repelled efforts by bankruptcy trustees to invade spendthrift trusts. On various theories, trustees have been forbidden to exercise rights against spendthrift trusts that are reserved by state law to unique or preferred classes of creditors." 88 B.R. at 816.

The Trustee improperly relies on *Schreiber, supra,* 50 F.3d at 271–76, for the proposition that the Debtor's Trust may be reached even if it is a spendthrift trust. *Schreiber* is not applicable because it did not deal with the concept of property of a bankruptcy estate under 11 U.S.C. § 541(c)(2) and the rights of a bankruptcy trustee. Regardless of what an individual creditor may be empowered to do under state law, or in federal court sitting in diversity and applying state substantive law under nonbankruptcy law principles, no similar rights or claims reside in a bankruptcy trustee. We thus conclude that the Debtor's Trust is a spendthrift trust which is exempt from the bankruptcy estate pursuant to § 541(c)(2), and therefore is not reachable to any extent by the Trustee.

### 2. *No "Residuary Trust" Arises as a Result of the Codicil to the Father's Will.*

Under the clear and unambiguous terms of Article Third of the Codicil, the entirety of the Estate after bequests to individuals and charities, and after tax payments necessitated by those bequests, was designated for the marital deduction of the Mother. When the Father executed his will in 1979, governing federal estate tax law permitted a testator to bequeath to a surviving spouse a specified sum that would be free of federal estate tax until the death of the surviving spouse. This commonly used tax-deferral mechanism, known as the marital deduction, was limited to the greater of $250,000 or one-half of the adjusted gross estate. The Father, in the Will, took advantage of this tax-deferral strategy, creating a marital deduction trust for the benefit of the Mother. Since, at the time, only one-half of the estate at most could be allocated to this Marital Trust, the Will provided for the "residue" of the adjusted gross estate to be placed in the Residuary Trust.

In 1981, Congress enacted the Economic Recovery Tax Act ("ERTA"). *See* 26 U.S.C. § 2056; and Pub.L. 97–34, Title IV, §§ 403(a)(1), (d)(1), 95 Stat. 301, 302 (1981). Among other things, ERTA increased the portion of an estate which was eligible for tax-deferral treatment through the marital deduction from the previous limits of $250,000 or one-half of the estate to an unlimited marital deduction. To take advantage of this change in federal estate tax law, many testators changed their pre-ERTA wills to avail themselves of the post-ERTA unlimited marital deduction rather than continuing to take only the pre-ERTA limited marital deduction. This was frequently done by way of codicil to an original will. In addition, Congress enacted a "transitional rule" to clarify that, if an old formula marital deduction was not revised or restated after ERTA, the prior limitation on the marital deduction would still apply.

It was against this background that the Father signed the Codicil in 1982, shortly after ERTA took effect. The Codicil expressly revoked the Marital Trust created by the Will. It then created a new Marital Trust, using an entirely different formula. The language pertinent to the present Marital Trust provides that, "if my wife survives me by six months, the sum set aside hereunder shall be equal to the minimum amount necessary which will result in no tax after taking into account (i) all credits available to my estate for federal estate tax purposes, but only to the extent that such credits do not increase death taxes on my estate, and (ii) all deductions allowed to my estate for federal estate tax purposes." Terrill explained that this is a "so-called minimum funding marital formula." He testified that, in his experience practicing in the trusts and estates area in Pennsylvania for more than 20 years, lawyers who wanted to incorporate the post-ERTA unlimited marital deduction typically utilized this formula. In administering the Estate, the Bank obviously adhered to this interpretation of the law in drafting the Codicil. The

effect of the Codicil was that the entirety of the Estate's assets was earmarked for the Marital Trust. Thus, we find that there was nothing left over for the Residuary Trust. As a result, we conclude that no Residuary Trust was ever funded by the Will, as amended by the Codicil.

The Trustee maintains that the Father did not avail himself of the unlimited marital deduction allow by the Congress and specifically elected, in his post-ERTA Codicil, to obtain pre-ERTA treatment for his Estate. We disagree with the Trustee's hypothesis because this reasoning ignores the express and unambiguous language of the Codicil indicating that the pre-ERTA Marital Trust contained in the Will was revoked and replaced with an entirely new marital deduction formula which was not included to come under the transitional rule.

The Trustee asserts that there has to be a Residuary Trust of the Estate in light of the substantial monetary gifts and assistance that the Mother has provided to the Debtor over the years. However, we find that the Mother gave gifts to her son, as well as to her other descendants, in her own right. Given the lack of inappropriateness of the Mother's gift-giving, we find the Trustee's assertion to be without merit. We therefore conclude that there is no Residuary Trust available to the bankruptcy estate under the terms of the Will and Codicil of the Father.

3. *The Trustee Has Rights to the Schoolhouse Lane Contents Which the Mother Has Not Specifically Identified as Hers.*

■■■ The Trustee also seeks, but with decidedly less vigor than the foregoing relatively valuable and liquid property, the personal property which is situated at Schoolhouse Lane. Since the Debtor has claimed no exemptions in this property, the Trustee is entitled to seize and liquidate any of that property which we find is in fact owned by the Debtor. *See In re Schachter,* 214 B.R. 767, 778 (Bankr.E.D.Pa.1997).

As we noted at page 561 *supra,* the evidence regarding the ownership of the personalty at Schoolhouse Lane is sparse and conflicting, and testimony as to specific items is confined only to a few objects which the Mother credibly identified at trial as belonging to her. The principal defense of the Defendants seems to be that the Trustee provided no or insufficient evidence that the Debtor, as opposed to other parties vaguely mentioned as potential owners such as the Debtor's children or his brother Philip, actually owned this property.

■■■ However, personalty property, unlike real property, cannot be traced to a definite owner by a chain of title. The Debtor is and has for some time indisputably been in possession of all of the contents of Schoolhouse Lane. Therefore, the rule which we stated thusly in *In re Atlantic Marble, Inc.,* 126 B.R. 463, 466 (Bankr.E.D.Pa.1991), comes into play:

"It is settled in Pennsylvania that possession of a chattel is deemed to be prima facie evidence of ownership. *Leitch v. Sanford Motor Truck Co.,* 279 Pa. 160, 123 A. 658 (1924). Thus, any person claiming ownership of property which is in the possession of another bears the burden of proving factors essential to his claim of ownership. *In re Carr's Estate,* 371 Pa. 520, 92 A.2d 213 (1952) (footnote omitted)." *Justice v. Fabey,* 541 F.Supp. 1019, 1023 (E.D.Pa.1982).

■■■ Although we recognized, in *Atlantic Marble, supra,* 126 B.R. at 466–67, that the presumption of ownership arising from possession may be "burst" by the introduction of evidence which tends to establish that the party in possession of the property in issue is not in fact its owner, in the absence of the testimony of the Mother or any other party except as to the few specific items of personalty in Schoolhouse Lane to which her testimony referred, we find that the residuum of the contents of Schoolhouse Lane must be deemed to be the property of the Debtor. Therefore, that property is subject to liquidation by the Trustee via her outstanding Sale Motion.

In order to allow the Trustee to proceed with the Sale Motion, we will promptly relist that Motion and a status hearing to determine when the Final Audit papers will be

filed in this case by the Trustee, on May 14, 1998.

*D. CONCLUSION*

An order consistent with the instant findings and conclusions will be entered.

*ORDER*

AND NOW, this 30th day of April, 1998, after a trial of this proceeding on March 18, 1998, March 19, 1998, and March 20, 1998, and upon consideration of the parties' posttrial submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of SELMA KATZ and CORESTATES BANK, N.A., as co-executors of the Will of Lawrence Katz, Deceased ("the Defendants"), and against CHRISTINE SHUBERT, TRUSTEE ("the Trustee"), on all claims referenced in the Complaint except with respect to the residual personal property of the Debtor located in his residence at 3343 Schoolhouse Lane, Philadelphia, Pennsylvania ("Schoolhouse Lane") over and above the property to which Defendant SELMA KATZ credibly claimed ownership, *i.e.*, all except the sculpture, artifacts, and art in the entrance hall and staircase in Schoolhouse Lane; the table, sofa, and rugs in its living room; its dining room table and chairs; and the armoire and rugs in (presumably) its master bedroom.

2. The Trustee's Motion to sell certain items on the Debtor's personalty, filed on December 5, 1997 ("the Sale Motion"), and most recently continued until the trial date of March 18, 1998, shall be listed for a final disposition, along with the status hearing to determine when the Trustee will file the Final Audit papers in this case, also most recently listed on March 18, 1998, on

THURSDAY, MAY 14, 1998, AT 9:30 A.M. gand shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.